JAMES E. BROOME, ADMINISTRATOR DE BONIS NON OF ARTE MACON, DECEASED, PLAINTIFF IN ERROR, v. THE UNITED STATES.

The act of Congress, passed on 2d March, 1799, (1 Stat. at Large, 705,) requires the bond given by a collector of the customs to be approved by the Comptroller of the Treasury.

But the date of such approval is not conclusive evidence of the commencement of the period when the bond began to run. On the contrary, it begins to be effective from the moment when the collector and his sureties part with it in the course of transmission.

Hence, where the surety upon the bond of a collector in Florida, died upon tne 24th of July, and the approval of the comptroller was not written upon the bond until the 31st of July, it was properly left to the jury to ascertain the time when the collector and his sureties parted with the bond to be sent to Washington; and they were instructed that before they could find a verdict for the surety, they must be satisfied from the evidence that the bond remained in the hands of the collector, or the sureties, until after the 24th of July.

Collectors are often disbursing officers; and they and their sureties are responsible for the money which a collector receives from his predecessor in office; and also for money transmitted to him by another collector, upon his representation and requisition that it was necessary to defray the current expenses of his office, and advanced for that purpose.

THIS case was brought up, by writ of error, from the Circuit Court of the United States f r the Northern District of Florida.

The facts are stated in the opinion of the Court.

It was submitted on a printed brief, by *Mr. Charlton,* for the plaintiff in error, and argued for the United States by *Mr. Cushing,* (Attorney-General.)

*Mr. Charlton,* for the plaintiff in error.

1. The first point we make is, that this bond never had a legal existence, so far as Macon was concerned. That he died before it was approved by the Comptroller of the Treasury; and having died before the time had arrived, when vitality was given to it by such approval, he was not a party to the contract; and his administrator is in no manner responsible for any default of Crane, in the discharge of his duties.

This writing obligatory belongs to that class of sealed instruments which, though not strictly escrows, yet are delivered, subject to a condition prescribed either by the parties, or the law.

By the act of Congress of 2d March, 1799, (1st vol. Little & Brown's edition, 705,) the bond of a collector of customs must be approved by the comptroller. If not so approved, it never becomes an official bond; the day of the date, we all know, is immaterial; and the manual delivery, even in such a case, coupled with the condition which the law itself annexes, does not give legal existence or vitality to the instrument. It is the approval by the Comptroller of the Treasury which breathes

into it its legal life. It is that which shows the *aggregatio mentium;* it is that which makes it a contract. Commonwealth *v*. Kendry, 2 Barr's Rep. 448. Suppose that the comptroller had refused to approve this instrument, would it then have had any efficiency? Would it have held the persons signing as sureties, liable for any default of Crane? Certainly not; for, as to them, there had been no contract with the government; they had offered to contract, but the offer had been declined. Does not this show, conclusively, that the approval of the comptroller is the act which, for the first time, gives any life to this paper? But when that life was given to it, Macon was dead; the offer he had made to become a surety for Crane, had never been accepted in his lifetime; his death withdrew the offer, and his administrator is not bound. Chitty on Contracts, 6th Amer. Ed. p. 9, and note 2, p. 12, citing Pothier; that it may be retracted at any time before acceptance, p. 13; and that death retracts it, p. 14, citing Pothier. See, also, p. 15; Macher *v*. Frith, 5 Wendell, 112, 113. If a contract was made at all, it was with Macon, not with his administrator. But can a dead man make a contract? The authorities cited, refer, it is true, to unsealed instruments, but there is the same principle here. If the paper was actually delivered, it was upon the condition that it should be approved by the obligee; that it was a condition that the law attached to it, and there was no *aggregatio mentium* until such approval; and, in the mean time, death had retracted the offer.

We think, therefore, that his honor, in the court below, committed error in ruling that the approval of the comptroller was not the act that gave this instrument its legal vitality.

And we think, that even if we are not correct in that view, still, that he was in error in refusing the instruction asked for by the counsel for the defendant below; that it was the duty of the plaintiff below to prove that the said bond was delivered before the death of Macon.

I will not stop to argue that if this paper was signed by Macon in the presence of witnesses, but not actually delivered by him, that it never bound him. I think we will all agree that if he signed it in the presence of a thousand witnesses, who attested it as sealed and delivered, yet, that if he purposely kept possession of it himself, it did not bind him. It was, therefore, the duty of the plaintiff below to prove a delivery in the lifetime of Macon. If the fact existed, he could and ought to have proved it, as he held the affirmative of the issue. But he did not offer even *primâ facie* evidence. The possession of it by the comptroller would be evidence of its delivery; but when? Would it show a delivery in the lifetime of Macon? Would it

not rather show that the comptroller did not receive it until the 31st July, 1837, the day on which he approved it; the presumptions of law being that an officer of the government discharges his duty with promptitude. 7 Howard, 132.

Though there may be evidence, then, that this instrument was ·livered to bind Crane and Swain, there is none, not even *primâ facie*, that it was ever delivered to bind Macon. Its date does not afford that proof, for the date of a deed is not any vital part of it at all. It is equally good without a date, or with an impossible date, and this shows that a date is no legal part of it. If we were to hold otherwise, we would fall into the absurdity of being bound by the assertion of a sealed instrument that it had been made on the 30th of February. Whilst the law forbids you to contradict, add to, or vary any part of a sealed instrument by parol evidence, it allows you and requires you every day to prove the time of delivery, even though a date be stated, and even though the date of such delivery should directly contradict the alleged date of the instrument, thus clearly showing that it does not consider the date inserted as any part of the instrument.

There is not a tittle of proof that any officer of the government ever had the possession of this paper until the 31st July, and then, for the first time, arises the presumption of its delivery; there is no proof that any of these parties ever parted with the possession of this paper before the 31st July, 1837, when it reached the comptroller, possibly from the hands of an agent of Macon, whose power to deliver would end with the death of his principal; and it is worthy of remark that, even according to the very vague and unsatisfactory testimony offered by the United States in the court below, as to the time it would take to transmit by mail, or messenger, from Tallahassee to Washington, that this paper could have been forwarded after the death of Macon, and reached Washington by the 31st. The language of the witness being *about* eight or ten days for transmission by mail, and by individuals, seven or eight days. A bond may be delivered by the surety to his principal as an escrow. 4 Cranch, 221

His honor, below, refused to give the instructions, as asked for, and ruled that the jury must be satisfied that the bond remained in the hands of Crane or the surety until after the death of Macon, thus virtually throwing the burden of proof upon us who held the negative, instead of requiring the plaintiff below to prove the act *in pais*, viz. the delivery necessary to give vitality to the instrument. 4 Wheaton's Rep. 77.

2. But if this bond ever was legally delivered in the lifetime of Macon, the question remains, did his principal, Crane, ever

make such default in the discharge of the duties of his office, as would bind his sureties?

The condition of the bond is, that Crane "shall continue truly and faithfully to execute and discharge all the duties of the said office according to law."

What were the duties of his office according to law? The statute of Congress of 2d March, 1799, prescribes them. 1st vol. Little & Brown's edition, p. 642. See, also, 2d act of same date, 708, top part of page.

Is there here any authority on the part of government to authorize Crane to become their financial agent, and to authorize him to collect moneys for the government outside of his official duties; and if not, could his sureties be bound by such acts?

Where, then, was the authority to authorize him to draw upon, or receive money from Breedlove, the collector at New Orleans?

Be that as it may, by what authority or law can the United States make the sureties responsible for the money collected by Crane from Willis? Is it part of the official duty of a collector of customs to collect from his predecessor the amount due by him to government? If there be such law, let it be shown. His honor, in the court below, virtually concedes this point, but then he destroys the effect of such concession, by instructing the jury that, although the money might have been received outside of his official duty, yet, as the government adopted the act and charged the amount to him, it was of course conclusive upon him, and that his sureties could not, with any propriety, complain, because it appeared from his accounts that, at the time Crane received the $1,279.92 from Willis, the United States were indebted to him (Crane) in a much larger amount, and that for some time thereafter, and after debiting his accounts with that sum, the balance was still against the United States, and in favor of Crane, and that the defalcation of Crane, for which his sureties were sought to be held liable, accrued long after that period, and that it was therefore immaterial to the sureties, &c.

We respectfully say that there is a mingling up, in this legal caldron, of very discordant materials, and that the reasoning is neither logical nor conclusive.

We are not going to deny that if a man, without any authority, collects the money belonging to another, that other may, if he pleases, confirm the act and sue the party who has assumed to act as his agent, for the amount he has thus collected. And we do not, therefore, dispute the reasoning of his honor in the court below, when he held, that after the government

adopted the act of the collection from Willis, and charged it to Crane, that it was, of course, conclusive upon Crane. What we object to is, the application of this principle, and the subsequent reasoning as to the sureties.

The government may, by an artificial and artistical way, make out the accounts between these parties, so as to obscure the true issue, but that cannot preclude us. It may make what rests it pleases in such accounts for such purposes, and it may, by inserting in the quarter ending the 30th September, an amount which their own evidence (that is, if there was any evidence at all of that receipt of money) shows was received on the 1st October. But the only true way of ascertaining whether the sureties are liable in this case, is to make out a general account of all sums received by Crane in his official capacity, and which it was his duty so to receive, and then to credit him with all payments which he properly made; and if the debits exceed the credits of such legitimate transactions, to that extent the sureties are responsible. When the judge below tells us, then, that although Crane had no right to receive this $1,279.92 from Willis, in his capacity as collector, (in other words, though it was not an act for which his sureties were responsible,) yet, that as the government owed him at that time, (a fact which, by the way, is inconsistent with their proof,) and for some time after, and as all his defalcations actually occurred afterwards, that, therefore, his sureties had no right to complain of this charge being made in the account, and that it was immaterial to them whether he had or had not received the sum in his official capacity, is, we repeat, not logical reasoning. If the sureties are charged in the general account with $1,279.92, which ought not to be charged to them, are they not so much the losers? Does it not deduct from the credits to which they are entitled, in the general account, running through all the time for which they were so responsible, just so much, and produce a corresponding effect upon the balance at the foot of the account? If this sum had not been charged against them, would there not have been exactly so much more due by the government to Crane as collector, for the payments legitimately made by him, as collector, and to the benefit of which indebtedness the sureties would be entitled?

It seems difficult to answer these questions negatively. What possible difference can it make, then, (even if it be so,) that Crane, after receiving this money, was still the creditor of the government? It is to the general result, at the close of his term of office, that we must look, and that general result, after deducting this illegal debit, must show, so far as the sureties are concerned, exactly so much more due by the government to

Crane, as collector, than now appears.    How, then, was it immaterial to the sureties?    And besides this error of law, the judge also erred in withdrawing the questions of fact from the jury, whether this money had ever been received by Crane, by virtually telling them that it was an immaterial fact in the case, and that the surety (the only person sued) was not sought to be charged by it, thus taking away the fact itself from their scrutiny.

He was asked, by the counsel of defendant below, to charge that the receipt for $1,279.92, given in the 4th quarter of 1837, is not a sufficient voucher to support the item of same amount in the account of third quarter, 1837 of Willis's transaction. This the judge refused to charge.

We respectfully insist that the government officers had no right to charge this receipt at all, either in the fourth or third quarter, against Crane, as collector.    It was a fact that did not officially come within their knowledge; to which knowledge the law confines them, in making out their transcripts for evidence.    Crane had never charged himself with it, as collector, but the government officer undertook to discharge the sureties of Willis for money for which, as far as we know, they were responsible, and to charge the sureties of Crane, without their assent, and this upon no other proof than the exhibition of a receipt purporting to be Crane's, but not proved to be so.    We think that this does not come within the purview of the statute of 3d March, 1797, and that the transcript was not a sufficient voucher to support the item, the original receipt being the best evidence (if evidence at all) of the fact of payment.    United States v. Buford, 3 Peters, 29; Cox and Dick v. United States, 6 Peters, 202.    Nor is the case in 8 Peters, 375, hostile, for there Orr was entitled to draw on the treasury for money, and the officers knew that they had paid it.    But in our case Crane had no right to receive the money at all, nor did he authorize the charge; and the United States had no right to relieve Willis by charging to Crane and his sureties.    See 3 Peters, 29.    Hoyt v. United States, 10 Howard, 132, 133.

*Mr. Cushing*, for the United States.

First point omitted.

II. The official bond of the collector and inspector, Crane. and his sureties, Swain and Macon, bears date 2d June, 1837.

Indorsed July 4th, 1837, by the District Attorney of the United States, that the sureties are good and sufficient.

"July 31st, 1837: approved on the above certificate.    George Wolf, comptroller."

Arthur Macon died 24th July, 1837, after the approval of the

sureties by the district attorney, but before the indorsement by the comptroller.

The administrator of A. Macon contended, that the surety died before delivery of the bond, and therefore that, as to him, it was not obligatory. To this end various instructions were moved by the administrator. The rulings of them by the court are to be seen, p. 48 of the record.

The several instructions on this subject, moved on behalf of the administrator, need not be here repeated. The charges of the court were correct; they left to the jury the question of fact of delivery, under all the circumstances, without any improper instruction as to the matters of law.

"A deed may be delivered by the party himself that doth make it, or by any other by his appointment or authority precedent, or assent or agreement subsequent."

"And so, also, a deed may be delivered to the party himself to whom it is made, or to any other by sufficient authority from him; or it may be delivered to any stranger, for and in the behalf, and to the use of him to whom it is made without authority." Touchstone, chap. 4, p. 57.

If a man makes an obligation to F, and delivers it to B, if F gets the obligation he shall have action upon it, for it shall be intended that B took the deed for F, as his servant." 13 Viner, Faits, (K) plea 7, page 23.

" If a man delivers a writing as an escrow, to be his deed, on certain conditions to be performed, and afterwards the obligor or obligee dies, and afterwards the condition is performed, the deed is good, for there was *traditio inchoata* in the life of the parties; *sed postea consummata existens,* by the performance of the condition, takes its effect by force of the first delivery, without any new delivery." Perryman's Case, 5 Coke, 84 – 6. S. P. Graham *v.* Graham, 1 Vesey, Jr. 272, 274; Froset *v.* Walch, Bridgm. 51 from Year Book 27 Hen. VI. 7.

" If I deliver an obligation or other writing to a man as my deed, to deliver unto him to whom it is made when he shall come to York, it is my deed presently; and if he deliver it to him before he comes to York, yet I shall not avoid it; and if I die before he comes to York, and afterwards he cometh to York, and he delivereth the deed unto him, it is clearly good, and my deed, and that it cannot be if it were not my deed before my death." 13 Viner, Faits, (M) plea 7, p. 24; and cites Perkins, sect. 143.

"And where the deeds have a kind of double delivery, there they shall take effect from and have relation to the time of the first delivery or not, *ut res valeat;* for if relation may hurt, and for some cause make void the deed, (as in some cases it may,)

13*

there it shall not relate. But if relation may help it, as in case where a *feme sole* delivers escrow, and before the second delivery she has married, or dieth, in this case, if there were not a relation the deed would be void, and therefore in this case it shall relate." Touchstone, chap. 4, page 72, Relation; Butler & Baker's case, 3 Coke, 35 *b*, Resolve 1 and 2; Cook's Adm'r *v.* Hendricks, 4 B. Monroe, 502 – 3.

A, being indebted to his bankers, executed a deed, purporting to be a mortgage to them, for securing the debt. After executing it, he delivered it to his attorney, who retained it in his possession till A's bankruptcy, which occurred about a month afterwards. The attorney then delivered it to the mortgagee. Held, that this was a good delivery by A to the mortgagee. Grugeon *v.* Gerrard, 4 Younge & C. 119.

If a deed is delivered by the grantor to any person in his lifetime to be delivered to the grantee after his decease, it was a good delivery upon the happening of the contingency, and related back so as to divest the title of the grantor, by relation from the just delivery. Foster *v.* Mansfield, 3 Metcalf, 412; O'Kelly and others *v.* O'Kelly, 8 Metcalf, 436, 439. See Exton *v.* Scott, 6 Sim. 31.

A delivers a deed, as an escrow, to J S to deliver over on condition performed, before which A becomes *non compos mentis;* the condition is then performed, and the deed delivered over; it is good, for it shall be A's deed from the first delivery. Brook's Reading on St. of Lim. p. 150.

The present is not the case of an escrow; and if it were it would not avail the obligors in the bond; the relation of which is clearly stated by Chief Justice Parsons, in the case of Wheelwright *v.* Wheelwright, 2 Mass. Rep. 447, and repeated by Mr. J. Sewall, in Hatch *v.* Hatch, 9 Mass. Rep. 307, 309, as follows:

"The delivery is an essential requisite to a deed, and the effect of it is to be from the time when it is delivered as a deed. But it is not essential to the valid delivery of a deed, that the grantee be present, and that it be made to or accepted by him personally at the time. A writing delivered to a stranger, for the use and the benefit of the grantee, to have effect after a certain event, or the performance of some condition, may be delivered either as a deed or as an escrow. The distinction, however, seems almost entirely nominal, when we consider the rules of decision, which have been resorted to, for the purpose of effectuating the intentions of the grantor or obligor, in some cases of necessity. If delivered as an escrow, and not in name as a deed, it will, nevertheless, be regarded and construed as a deed from the first delivery, as soon as the event happens, or the condition is performed, upon which the effect had been suspended,

if this construction should be then necessary in furtherance of the lawful intentions of the parties.   See also 3 Coke on Littleton by Day, 36 *a* note 223.   Perkins, sec. 137, 138, 142.   Bushel *v.* Passmore, 6 Mod. 217; Maynard *v.* Maynard, 10 Mass. Rep. 486; Bodwell *v.* Webster, 13 Pickering, 411, 416; 4 Cruise, by Greenleaf, p. 28, note; Elsey *v.* Metcalf, 1 Denio, 323; Brown *v.* Brown, 1 Woodbury & Minot, 325; Doe dem. Gurnons *v.* Knight, 8 Dowl. & R. 348; Doe dem. Lloyd *v.* Bennett, 8 Car. & P. 124.

" The delivery of a deed may be inferred from circumstances," per Mr. Justice Story, Gardiner *v.* Collins, 3 Mason, 401.

The possession of the deed by the lessor or plaintiff, who offers it in proof, is *primâ facie* evidence of its delivery.   Under ordinary circumstances, no other evidence of the delivery of a deed than the possession of it by the person claiming under it, is required." Games *v.* Stiles, 14 Peters, 327; S. P. Hare *v.* Horton, 2 Nev. & M. 428; 5 Barnwell & Ad. 715.

" If the original deed remained in existence, proof of the handwriting, added to its being in possession of the grantee, would, it is presumed, be *primâ facie* evidence that it was sealed and delivered.   No reason is perceived why such evidence should not be as satisfactory in the case of a deed as in the case of a bond."   Lessee of Sicard *v.* Davis, 6 Peters, 137.   In that case the original deed was lost, but the execution and the delivery thereof were inferred from circumstances.

"All deeds do take effect from, and therefore have relation to, the time, not of their date, but of their delivery.   And this is always presumed to be the time of their date, unless the contrary do appear."   Touchstone, chap. 4, sect. 8, p. 72.

These principles seem to me to be sufficient to warrant the rulings and charges by the court, on the subject of the delivery of the bond.

If a bond, with surety required by law of an officer, be signed and sealed by the parties who are named as obligors to the United States, and sent by mail, or by private conveyance, to the proper department, and be sued upon by the United States, such circumstances must be *primâ facie* evidence of delivery; which delivery must be presumed to be the time of the date, until the contrary be made to appear; otherwise the great affairs of this government, spreading over such vast territories, requiring bond and security from officers intrusted with the collections or disbursements of public moneys, could not be administered safely, unless all the various officers, who are by law required to give bond with security, to be filed in the proper department, should be required to come with their sureties to the seat of government, and execute and deliver in person, in the proper office,

their respective obligations. Such a rule would be highly inconvenient, excessively dilatory, if not impracticable. Such a rule could be endured only in a village, town, or city, or in a district of country of small extent.

That A. Macon signed the bond is admitted. After he signed and sealed he did not keep it in his possession; it was not found after his death among his papers; he delivered it to some person; the purpose for which he signed and sealed the bond was, that it should be delivered into the proper department of the government; it expresses that purpose on its face, and to that intent it expresses to have been "sealed and delivered in the presence of witnesses, — Robert Lord, George G. Holt," who, as witnesses, have signed their names. It came to the possession of the proper department of the Government of the United States, and was given in evidence by the department.

From all these circumstances the inference is irresistible that, after A. Macon signed and sealed the bond, and caused it to be attested by the witnesses, he delivered it to some person to be sent to the proper department of the Government of the United States, the obligee named in the bond. The jury have found in favor of the United States, without any improper instruction from the court, and the verdict is conclusive.

III. The question raised for the defendant in the District Court, now plaintiff in error, as to the sum of $1,279.92 appearing in the account against Mr. Crane, as collector of the customs for the district of St. Mark's, and inspector of the revenue for the port of Magnolia, is so properly and clearly treated of by the judge in his charge to the jury, as not to require of me any thing in addition to what he has said.

As to the sums of $3,000 and $6,500, it appears in evidence that they were paid to Crane, upon his representation and requisition, to defray the current expenses of his office; and on this account the judge ruled that they were legitimate charges as against his sureties.

This view is supported by the provisions aw which require the collector to pay the expenses of his office out of its revenue, or to disburse the money received by him from the government to supply any deficiencies in such revenue. See Act of 1799, (1 Stat. at Large, 707); Act of 1823, (3 Id. 723.)

The government advanced money to Crane, under the statute cited, to defray the expenses of his office.

The conditions of the collector's bond were to execute and discharge all the duties of his office faithfully. This condition was broken if the collector made false statements to the Comptroller of the Treasury of the sums necessary to the current expenses of the district whereof he was collector, and false requi-

sitions upon the Treasury Department, for moneys to pay those current expenses, it was a *malfeasance* in office, a breach of the condition of the collector's bond, for which the surety was chargeable.

The collector was, by law, the officer to pay the current expenses of the district whereof he was appointed collector, and he and his surety were properly chargeable with all moneys put into the hands of the collector for such purposes.

Mr. Justice WAYNE delivered the opinion of the court.

Ambrose Crane was appointed collector of customs for St. Mark's, in Florida, and signed, with his sureties, Swain and Macon, what was meant by them to be an official bond. The form of the bond is given in the statute. This conforms to it in every particular. 1 Stat. at Large, 705. Crane, the collector, became a defaulter. This suit was brought to recover the amount of the defalcation from the administrator of Macon, one of the sureties of Crane. The bond is dated on the 2d June, 1837. Two indorsements are upon it. One of them was made by the District Attorney of the United States for Florida.

Office of the United States Attorney, Middle District of Florida, July 4th, 1837. I hereby certify, that Peter H. Swain and Arthur Macon, Esqrs., who appear to have executed the within bond as securities, are generally esteemed to be, and in my opinion undoubtedly are, good for the amount of this bond. They reside in Leon county, and I would take either of them, without hesitation, as security for a private debt of that amount. The signatures appear to be genuine.

CHARLES S. SIBLEY, *District Attorney.*

The other indorsement is as follows:

Comptroller's Office, July 31, 1837. Approved in the above certificate. GEORGE WOLFE, *Comptroller.*

Macon died on the 24th July, seven days before the date of the comptroller's approval, and twenty-four days after the date of the district attorney's indorsement. The evidence in the case shows that, in the year 1837, the mail time between Tallahassee and Washington was from eight to ten days. The distance might have been travelled by an individual in less time, but not in less than seven or eight days. This testimony was introduced by the plaintiff to prove that the bond, if it had not been delivered before the 24th of July, the day of Macon's death, that it must have been in the course of transmission from the obligors before that day, as the comptroller's approval is

dated the 31st of the month. The act directing bond to be taken from collectors, with sureties, to be approved by the Comptroller of the Treasury of the United States, will be found in 1 Stat. at Large, 705. It is, that every collector, naval officer, and surveyor, employed in the collection of the duties upon imports and tonnage shall, within three months after he enters upon the duties of his office, give bond, with one or more sureties, to be approved by the Comptroller of the Treasury of the United States, and payable to the United States, with condition for the true and faithful performance of the duties of his office, according to law. The condition of the bond is, that whereas the President of the United States hath, pursuant to law, appointed the said                to the office of        , in the State of          . Now, therefore, if the said has truly and faithfully executed and discharged, and shall continue truly and faithfully to execute and discharge all the duties of said office, according to law, then the above obligation is to be void and of none effect, otherwise it shall abide, and remain in full force and virtue.

In this state of the case, a recovery upon this bond is resisted by an objection that it never had a legal existence as to Macon, the intestate of the appellant, because he died before it was approved by the comptroller. It is not denied — or, if it be, the evidence makes it altogether probable — that the bond had been delivered before Macon died. We cannot admit that the date of the approval can be taken absolutely as the time when the bond was accepted, without any relation to the time when it was delivered. A bond may not be a complete contract until it has been accepted by the obligee; but if it be delivered to him to be accepted if he should choose to do so, that is not a conditional delivery, which will postpone the obligor's undertaking to the time of its acceptance, but an admission that the bond is then binding upon him, and will be so from that time, if it shall be accepted. When accepted, it is not only binding from that time forward, but it becomes so upon both from the time of the delivery. That is the offer which the obligor makes, when he hands the bond to the obligee, and in that sense the obligee received it. Such is just the case before us. The act requires the collector to give a bond, "with sureties to be approved by the comptroller;" it must be done in three months after he has entered upon the duties of his office; it must be retrospective to that time, and be for the future also. The comptroller may accept the sureties or reject them. He may call at any future time for other sureties, if circumstances shall occur, or information shall be received, which make it necessary that the United States should have a more responsible security.

Or he may call, under the direction of the Secretary of the Treasury, for a new bond. He may decide upon the sufficiency of the sureties before they have made themselves so, or after they have signed the collector's bond. The first course is not the usual practice. The bond is commonly sent to the collector with such sureties as he can get. The comptroller receives it under the law, to be afterwards approved, upon such information as he has or may procure, concerning the responsibility of the sureties. The time is not limited for the use of his discretion for that purpose. He knows, and the collector knows, that the bond ought to be given in three months after the collector has begun to discharge the duties of his office. It is his duty to give the bond. It is the comptroller's to see that it is done. It is not necessary that it should be handed to the comptroller. It may be handed to an agent appointed by the comptroller to receive it, or it may be put into the possession of any person to deliver it, or it may be transmitted by mail. If done in any one of these ways, it is a delivery from the moment that the collector and his sureties part with it. It is from that moment in the course of transmission, with the intention that the law may act upon it through the comptroller's agency, and his subsequent approval is an acceptance with relation to the time beginning the transmission. The statute does not require the approval to be in writing. It may be so, and may be done verbally; or it may not be done in either way. Receiving the bond, and retaining it for a considerable time without objection, will be sufficient evidence of acceptance to complete the delivery, especially when the exception is taken by the party who had done all he could to complete it. Postmaster-General v. Norvell, 1 Gilpin Rep. 106 – 121. And we add, that the retention of such a bond by the comptroller without objection, for a longer time than the statute requires it to be given, would be presumptive evidence of its approval and acceptance. This presumption of acceptance has been ruled by this court, in the case of the United States Bank v. Dandridge and others, 12 Wheat. 64. In that case, an objection was taken in the Circuit Court to the admissibility of evidence to show a presumptive acceptance of a cashier's bond, because the charter of the bank required a bond to be given satisfactory to the directors. The Circuit Court sustained the objection, and ruled that the approval must be in writing to bind the cashier's sureties. This court ruled otherwise. Presumptive evidence, then, being admissible to prove the acceptance of a bond — such as its being in the possession of the obligee — having been retained without objection, and the obligor continuing to act under it, without having called for a more formal acceptance, it follows that a written

acceptance, dated after a delivery, as was done in this case, is not to be taken as the time from which the completeness of the contract is to be computed; but that such an acceptance has a relation to the time of delivery, making that time the beginning of its obligation upon the parties to the bond. We remark, also, that there is no rule which can be applied to determine what constitutes the approval of official bonds. Every case must depend upon the laws directing such an approval. The purpose for which such a bond is required must be looked to. The character of the office and its duties must be examined. The time within which such a bond must be given and approved, and whether it is to be retrospective or for the future only, must be considered before it can be determined how and when the approval must be made. The differences suggested may be seen by comparing the terms of the statute of 1825, requiring bonds to be given by postmasters directly to the Postmaster-General, and not to the United States, with the phraseology of the section of the act directing bonds to be taken from the collectors to the United States.

The case of Bruce and others v. The State of Maryland, for the use of Love, in 11 Gill & Johnson, 382, which was supposed to have a bearing upon the case, will illustrate fully, the differences of which we have spoken.

The 42d article of the Constitution of Maryland, requires bonds from the sheriff of that State, with sureties, before they can be sworn in to act as such. The act of Maryland, carrying that article into operation, (2d vol. Laws of Maryland, November, 1794,) fixes the time within which sheriffs shall give bonds, and the manner of taking them is prescribed. It must be done in a county court, or before the Chief Justice, or two associate Justices, &c., but by whomsoever approved, the act directs that the official doing so, shall immediately transmit it to the County Court to be recorded. The case came before the Court of Appeals, from a county court, which had decided that the bond of the sheriff operated from its date, that bond having been given without the approval in the manner prescribed. The Court of Appeals overruled the court below, saying that the bond had been irregularly taken, and that a sheriff's bond was only obligatory from the time of its approval. Under that statute, the question, when a sheriff's bond became operative, could not properly occur, it having made the delivery and approval of the bond simultaneous, that there might be a compliance with the constitution, which declared that no sheriff should act until he had given bond. The act which we have been considering, does not require the comptroller's approval to be in writing. A collector may be permitted to dis-

charge the duties of his office, for three months, before he gives a bond, if the Secretary of the Treasury shall think it safe to be done. But if otherwise, he may require a bond before the collector enters upon the duties of the office. The statute means that the three months allowed for a bond to be given, is an indulgence to the collector, and not a rule binding upon the government, when its proper functionary shall determine that a bond shall be given earlier. We think, too, that the approval by the comptroller is directory, and not a condition precedent to give validity to the bond. The doctrine that deeds and bonds take effect by relation to the time they are delivered, is well understood. The cases cited by the Attorney-General, in support of it, are sufficient for the occasion. We need not add to them. It applies to this case. Macon was bound as the surety of Crane, by the delivery of the bond before his death. The evidence in support of such a delivery, was fairly put to the jury.

We have compared the charge of the judge, with the instructions which were asked by the counsel of the defendant, upon the point we have been considering, and we think that it covers all of them correctly.

Another objection against a recovery upon this bond remains to be disposed of.

It is said that Crane, the collector, received money belonging to the United States, out of the line of his duty, which has been improperly charged to make up the amount of the defalcation, which his sureties are now called upon to pay.

The duties of collectors have been much multiplied by other acts, since the act of 1799 was passed. Scarcely an act, and no general act has been passed since, concerning the collection of duties upon imports and tonnage, without some addition having been made to the collector's duties. They are suggested from experience. The collector, too, has always been a disbursing officer for the payment of the expenses of his office, and may pay them out of any money in hand, whether received from duties or from remittances to him for that purpose, where the expenses are not unofficial, have been sanctioned by law, and have been incurred by the direction of the Secretary of the Treasury. For such payments, he may credit himself in his general account against the sums which may have been received for duties. He may retain his own salary, or fees and commissions; pay the salaries of inspectors and other officers attached to the office; make disbursements for the revenue boats, lighthouse buoys, &c., and apply money collected for duties, to all expenses lawfully incurred by himself or by his predecessors. For such as may have been incurred by his predecessor, he may

receive from him any money in his hands, when he is going out of office, belonging to the United States, and which have been retained by him for the payment of such expenses.

When so turned over to a successor, he receives it officially, to be applied by him to the purposes for which it had been retained. Himself and his sureties are as much responsible for the faithful application of it, as they are for his fidelity to his trust, for duties received by himself, or for other sums which may have been remitted to him by the order of the government. It has often been the case, and must be so again, as it now is, that the convenience of the government and the interest of its citizens, require collection districts to be established, which do not, and are not expected at first to pay expenses. Remittances then must be made for such purposes. They are made to the collector, because it is under his personal supervision that the work is done, or the goods are furnished for the government, at the point of his office where the law requires him to reside. What we have said, covers all of the remittances which were made to Crane, by Breedlove, the collector of Mississippi; and also the payment of $1,279.92 received by him from Willis, his predecessor, when he was going out of office, and when Crane was coming in. It appears, from the accounts, that he received it as collector. It cannot be denied that there was then a debt due by the government, on account of the expenses of the office, to which that sum ought to have been applied. Had it been so, he would have been credited with the sum in his next quarterly settlement. And if it was not so applied, it cannot be said that there was fidelity to his official trust in withholding it and applying other money of the government subsequently collected or received, to the payment of its antecedent debt. In this instance, there is less reason for not exempting the securities of Crane from responsibility for the sum received by the collector from his predecessor, because the evidence in the case shows it was afterwards sanctioned by the government, and that it might have been applied by the collector to the liquidation of an official debt, as far as it would go, due by this government to himself. What has been said, covers every instruction which the court below was asked to give upon this point. We do not think that the judge erred in his general charge upon them to the jury, or that in making the charge which he did, that there is any error of which the defendant can complain.

We affirm the judgment below, and direct a mandate to issue accordingly.

Mr. Justice CAMPBELL.

I dissent from the judgment of the court in this case.

The certificate of the Comptroller of the Treasury, of his approval of a bond which it is made his duty to accept on behalf of the government, is the best evidence of the time of its delivery, as a valid and operative obligation. If another date is asserted by the government, the burden of sustaining it by clear proof, devolves upon it.

The instruction to the jury by the District Judge, "that the time of the approval of the bond, at the Treasury Department, is not to be taken as the time of delivery," was, in my opinion, too general, and is erroneous.

The District Judge further instructed the jury, that although the bond "may not have come to the hands of the officers of the government" till after the death of one of the obligors, yet "if they had parted with it for the purpose of sending it, or having it sent to Washington city, before that time," that would charge the legal representative of the person who had died.

The delivery of a bond is only complete when it has been accepted by the obligee, or a third person, "for, and in his behalf, and to his use."

The terms I have quoted from the Touchstone, imply a cession of the title to the paper in the act of delivery.

The third person, who thus represents the obligee, is not subject to the mandate of the obligor, nor amenable to his control.

The instructions of the District Judge would be satisfied by any surrender of the custody of the paper, if for the purpose of having it sent to Washington city; whether it be to the agent or servant of the obligors, who would be subject to their orders, or by its inclosure in a letter, the delivery of which might be countermanded; in other words, by acts which did not amount to a surrender of the property or legal right to control the paper. This, in my opinion, was erroneous. With respect for the opinion of this court, I enter, therefore, my dissent to the judgment which affirms these instructions.

## Order.

This cause came on to be heard on the transcript of the record, from the Circuit Court of the United States for the Northern District of Florida, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court, in this cause, be, and the same is hereby, affirmed, with interest, until paid, at the same rate, per annum, that similar judgments bear in the courts of the State of Florida.