State v. Sooy.

---

THE STATE OF NEW JERSEY v. SOOY, IRICK AND OTHERS.

1. Sureties on the bond of the state treasurer are liable for moneys received by him during the continuance of their suretyship, and used by him in payment of arrears due from him to the state at the time the bond was given.

2. S. was treasurer of the state from January, 1873, to September, 1875. In April, 1875, he gave a new bond, with new sureties. He was then a defaulter to the state. After April, 1875, he received a large sum of public moneys, part of which he applied to discharge his prior defalcation, and part he failed to account for. *Held*, in an action on the new bond, that his sureties were liable for both amounts.

On special verdict.

Argued at June Term, 1877, before BEASLEY, CHIEF JUSTICE, and Justices DEPUE, VAN SYCKEL and KNAPP.

For the plaintiff, *Jacob Vanatta.*

For the defendants, *Cortlandt Parker.*

The opinion of the court was delivered by

DEPUE, J.   This action was on a bond given by Sooy, as treasurer of the State of New Jersey.

The office of treasurer is an annual office, elective by the legislature in joint meeting.   Sooy was duly elected treasurer in 1873 and in 1874, and was continued in office in 1875, until the 1st day of September, 1875, by the failure of the legislature to elect his successor.   Shortly before the 1st of September, 1875, it was discovered that he was a defaulter, and on that day he surrendered his office, and a new treasurer was appointed by the governor.

In March, 1875, Sooy gave a new official bond, on which the other defendants became sureties.   This bond is dated March 30th, 1875, and was approved by the senate and general assembly on the 8th of April, 1875.   In the absence of other evidence of delivery, it must be taken to have been delivered on the date of its approval.   The condition of the bond is as follows: " The condition of this obligation is such, that if the above bounden Josephus Sooy, junior, shall from time to time, and at all times, render a just and true account to the legislature of the State of New Jersey, when by them thereunto requested, of all. money, securities, stock and other property of the said state which shall come to his hands, or be committed to his charge, and deliver the moneys, securities, stock and other property of said state, in his hands, together with all documents of said state, to his successor in office, and shall well, honestly and faithfully perform all the duties of the office of treasurer of said state, and shall answer for all improper appropriations, waste, embezzlements or destruction of said moneys, securities, stock, property, docu-

ments, instruments of writing, papers or books, which shall be done or committed by any person or persons to be by him employed in said office, then this obligation to be void, otherwise to be and remain in full force and virtue."

The material parts of the breaches assigned are—1. That the said Sooy did not, during that time, or at any time since, deliver the said moneys so by him received, to his successor in office, but kept, withheld and retained said moneys; and, 2. That the said Sooy did not, during that time, well, honestly and faithfully perform all the duties of the office of treasurer of said state, but, on the contrary, embezzled said moneys, and applied them to his own private use.

At the trial, all the issues in the record were found in favor of the state, except the issue of performance of the condition and payment. On these last issues a special verdict was found, which is now before the court for judgment thereon.

At the time of the making and delivery of this bond, Sooy appeared to be a defaulter in the sum of $68,321 24 for dividends due the state on its stock of the United Railway and Canal Company, and taxes due from said company in lieu of transit duties, which he had before that time received and withheld, embezzled or applied to his own use.

After the delivery of this bond, Sooy received from the same source the sum of $130,437.90. Of this sum, he failed to enter upon the books of his office the sum of $18,061.58, making the gross amount of his defalcations, on the 1st of September, 1875, apparently the sum of $87,382.78. A subsequent examination of the books of the Union Bank of Mount Holly, disclosed a deposit by Sooy, to the credit of the state, of $28,321.22, which did not appear on the books of the treasurer. Of this sum, $18,321.22 were deposited before the 24th of March, 1875, being the proceeds of prior collections, and $10,000, a deposit of June 25th, 1875, which is one of the sums applied to the tax due for the quarter ending March 31st, 1875. By this discovery, the actual defalcation of Sooy, while in office, was reduced to the sum of $59,061.56.

On the 2d of September, 1875, Sooy gave to the attorney-general a draft on the said bank for $14,944.92. The fund out of which this draft was paid, did not appear on the books of the bank as a credit to the state, but appeared on said books to be the property of the bank, and had stood in that shape since January, 1874. It was either the proceeds of collections before January, 1874, or the private moneys of Sooy. By this means, the loss of the state, from the official malversation of Sooy, was reduced to the sum of $44,116.64.

Under the circumstances of this case, the defendants cannot be allowed a credit of any part of either of these sums of $28,321.22, or $14,944.92, on the $18,061.58, which was a defalcation out and out. They must be applied as a credit, generally, on the account, as a payment of the earlier items, and in reduction of the amount of the defalcation. In this way the defendants obtain all the benefit of the above-mentioned sums they are legally entitled to.

The judgment, therefore, must be entered for $18,061.58, or $44,116.64.

The defendants contend that, as sureties, they are not liable for the prior defalcations of their principal, and that moneys received by him and paid over to the state, during the continuance of their suretyship, must, under all circumstances, be applied to the discharge of their obligation.

The determination of the soundness of these two propositions, and of their applicability to the present case, will determine for which of these sums judgment should be awarded.

It is conceded that sureties on an official bond are not liable for the prior defalcations of their principal. They are answerable for moneys received by him of his predecessor, or previously collected by him, if such moneys were actually in hand at the time of the giving of the bond; but they are not liable for past derelictions of duty, unless the bond be retrospective in its language. *Farrar* v. *Brown*, 5 *Pet.* 373; *Broome* v. *United States*, 15 *How.* 143; *Hassell* v. *Long*, 2 *M. & S.* 363; *Freeholders of Warren* v. *Wilson*, 1 *Harr.* 110; *Patterson* ads. *Inhabitants of Freehold*, 9 *Vroom* 256.

But this principle is in no wise in controversy in this case. The special verdict finds that after the 8th of April, 1875, Sooy received $130,437.90, at the times and in the amounts specified as follows :

| | | |
|---|---|---|
| April 24th, 1875, check for . . $2,000 00 | | |
| "   27th,   "        "     . . 21,000 00 | | |
| | | |
| Being balance of monthly dues of April, . . | $23,000 00 | |
| April 27th, 1875, check in payment for said | | |
|    tax for the month of March, 1875, . . | 24,844 08 | |
| May 7th, check for . . . $1,500 00 | | |
| "   19th    "    . . . . 1,500 00 | | |
| "   28th    "      . . . 1,500 00 | | |
| June 10th,   "    . . . . 1,500 00 | | |
| "   24th,    "     . . . 8,000 00 | | |
| "   24th,    "     . . . 10,000 00 | | |
| "   24th,    "     . . . 844 08 | | |
| | | |
| Being for taxes due and to become due, for the | | |
|    month of May, 1875, . . . . | 24,844 08 | |
| June 24th, " as and for taxes due or to become | | |
|    due for the month of June, 1875," . . | 24,844 08 | |
| July 8th, . . . . . $2,000 00 | | |
| "   19th   . . . . 20,000 00 | | |
| | | |
| Being in payment of the tax for the month of | | |
|    July, . . . . . . . . | 22,000 00 | |
| July 19th, " for quarterly dividend, due July | | |
|    1st, 1875," . . . . . . | 7,217 50 | |
| August 14th, "in payment of tax due for July, | | |
|    1875," . . . . . . . | 2,844 08 | |

In the books kept in the treasurer's office, in compliance with the statute, and which it was the duty of Sooy to keep, these moneys were, in part, misappropriated, as follows :   Of the receipts " of monthly dues for April, 1875," $21,844.08 were applied to the tax for the quarter ending March 31st, 1875.   Of the receipts for the tax for the month of March,

1875, $18,633.04 were applied to the tax for the quarter ending December 31st, 1874, which tax had been received by him of the company before the receipt of the last-named moneys. Of the several sums received "for taxes due and to become due" for May and June, the sums of $8000, $10,000, and $24,844.08, were applied to the tax due for the quarter ending March 31st, 1875, which tax had been paid to him by the company before the 1st of May, 1875. And of the moneys received in July, for taxes due in July, the sum of $3633.04 was applied as the balance of tax due for the quarter ending March 31st, 1875. Of the moneys received after April 8th, 1875, for taxes and dividends due the state after that date, the amount so applied in satisfaction of dividends and taxes due, and, in fact, received by the treasurer prior to that date, was $68,321.20.

That these moneys were applied by Sooy to the payment of the amount due from him to the state for taxes due in December and March previously, is apparent from the character of the transaction. By statute, the treasurer is required " to state, in books, the accounts of moneys which he shall receive for taxes, * * or on any other account for or in behalf of the state, * * in such a manner that the net produce of the whole revenue, as well as every branch thereof, may distinctly appear, (*Nix. Dig.* 998, § 7); and, forthwith, upon the receipt of interest or other moneys belonging to the state, * * to report the same to the comptroller for audit and registry, before any acquittance or discharge is given therefor." *Nix. Dig.* 1005, § 55. And it is made the duty of the comptroller " to supervise the collection of the revenue, and to take general charge of all the rights, interests, and property of the state. *Nix. Dig.* 1003, § 38.

The object of these provisions was to provide for an official record in the treasurer's office, not only of the moneys received, but also of the sources from which they were derived, and the demands due the state, to which they should be applied, and to obtain from the report of the treasurer to the comptroller, a similar record in the comptroller's office, as a

verification of the transactions in the treasurer's office, and to enable the comptroller to supervise the collection of the public revenues. The appropriation of these moneys to the dividends and taxes due in December and March, was not only entered in the books in the treasurer's office, but was also reported from time to time, as the moneys were received, to the comptroller, and corresponding entries thereof made by him from such reports.

Independently of the annual accounting to the legislature, the only supervisory authority over the treasurer is the comptroller, to whom he is required to report his receipts for audit and registry, before any acquittance or discharge is given. These reports are an accounting by the treasurer with the comptroller, as the auditing officer of the state. Such reports, when approved by the comptroller, must, as applications of moneys received, be regarded as official acts of such a nature as not to be gainsayed.

The contention of the defendants is, that they cannot be prejudiced by the appropriation of these moneys by Sooy to the payment of taxes received by him before their bond was given, and that the moneys having in fact gone into the public treasury, must be applied to the account on which they were received.

At the time of the application of moneys received after the 8th of April, 1875, Sooy was indebted to the state in the amounts so applied, for taxes and dividends received in December, 1874, and after that date. He became a debtor to the state for taxes and dividends received after the defendants' contract of suretyship. The appropriation of payments under such circumstances is regulated by a rule of law, which, as a general rule, must be regarded as completely settled. In the first instance, the right to direct to what particular debt the payment shall be applied, is with the debtor. If he gives no directions, the creditor may make the appropriation himself, and in the absence of all indications of the will or intention of the parties, the law will apply the payment according to its own notion of the intrinsic justice of

the case. *White* v. *Trumbull,* 3 *Green* 314; *Oliver* v. *Phelps,* *Spenc.* 180; *Terhune* v. *Colton,* 1 *Beas.* 312; 1 *Am. Lead. Cases* 339. As a general rule, this right of appropriation by the parties is unlimited and unqualified. It is not taken away or impaired by the effect of the appropriation on the rights of third persons. *Edwards* v. *Derrickson,* 4 *Dutcher* 39–67. It is only when the court is called upon to make the appropriation, in the absence of an appropriation by the parties, that the equities of third persons will be allowed any influence. Highly favored as sureties are in the law, their equities are subordinated to the legal rights of the debtor to direct how his payments shall be applied. As was said by Best, C. J., in *Williams* v. *Rawlinson,* 10 *Moore* 371, " if the principal consented to such an appropriation, there is an end of the question, for he had clearly an option as to which account the payment should be applied to, and he alone had an unfettered right in this respect, and over which the defendant, as surety, could have no control, unless there were an express or distinct agreement entered into at the time of the execution of the bond."

It is insisted that sureties on an official bond are excepted out of the operation of this rule of law ; that in such cases neither the principal nor the government enjoys this right of application of payments; and that the duty of making such application devolves upon the court; and that, in the performance of that duty, receipts will be credited on the accounts on which they were received by the officer. If such an exception exists, the reasons on which it is founded are not apparent, especially if it be so far-reaching in its operation as to impose a loss on the government, arising from the misappropriation of public moneys by the officer for whose fidelity the sureties have undertaken. It furthermore imposes a duty on the government of inquiring, at its peril, from what sources moneys remitted by its officer were derived—a duty which does not devolve upon a private individual holding the obligation of a surety.

Decisions of the federal courts were cited to support this

defence. *United States* v. *January*, 7 *Cranch* 572; *United States* v. *Giles*, 9 *Cranch* 212; *United States* v. *Eckford's Executors*, 1 *How.* 250; *Bryan* v. *United States*, 1 *Blackf.* 140; *Postmaster General* v. *Norvel*, *Gilpin* 106; *Myers* v. *United States*, 1 *McLean* 493; *United States* v. *Linn*, 2 *McLean* 501.

*United States* v. *January*, as explained by Judge Story in 5 *Mason* 87, n., only decided that there was no right of appropriation after payments had been made upon general account. In that case, it appears from the opinion of the court, that there was a general account kept with the officer, and that the payments were "indiscriminately made." In United States *v.* Giles, the payment was made by the officer "without declaring what particular item in the account of the United States against him should thereby be discharged." The court say, "if there be no designation how a sum paid on account shall be credited, and there be sureties for part of the debt, as was the case here, it seems reasonable to some of the judges to let them have the benefit of it in such a way as to exonerate them." "But," the judge continues, "this is not the opinion of a majority of the judges; they think, and such is the decision of the court, that the United States have a right to apply these payments in a way most beneficial to themselves." In that case the bond was dated the 9th of January, 1801. Giles was then in arrear in the sum of $3763.98, for moneys collected by him prior to that date. He became further in arrear in the sum of $1683.52, for moneys which he had received after January 9th, 1801, and before March 27th, 1801, when he was removed from office. After his removal, on the 13th of April, 1803, he paid to the United States attorney $6238.35. The majority of the court held that the United States had a right to apply the money paid by the officer upon the antecedent defalcation, so as not to extinguish the sum of $1683.52, for which the sureties were accountable. As I read the opinion of the court, it does not, either in its circumstances, or in the reasoning of the court, or in the result, sustain the views of the defendants.

In United States *v.* Eckford's Executors, the funds which the treasury officers had applied to a prior defalcation, were received by the officer after the giving of the official bond in question, and were paid over to the government " without any special direction as to their application." In Bryan *v.* United States, the moneys for which the government sought to hold the sureties liable, had been remitted to their principal after his term of office had expired. In Postmaster-General *v.* Norvel, which was a charge of a district judge to the jury, the question, as propounded by the judge, was, "·whether the government, for whose security both bonds were given, could apply moneys collected after and under the second bond, and on the responsibility of the sureties in the second bond, to the payment or credit of the balance due on moneys collected, and which ought to have been paid by and under the first bond." In the two cases cited from McLean's Reports, the question was solely as to the right of the government to apply moneys received and paid over by the officer in the regular course of his duties, subsequent to the date of his bond, to discharge a balance due from him before that date. The right of the government to make such application was denied.

In none of these cases was the power of the officer making remittances, to direct how the moneys remitted should be applied, under consideration. In each case the result was entirely consistent with the existence of such right in the debtor. The remittances were of such a character as impliedly to amount to an appropriation by the officer to a specific purpose, which the government sought to defeat by diverting the funds to another purpose; for an appropriation of a payment by the debtor need not be expressed in terms. It may be inferred, from the nature of the transaction, that he intended its application to one account specifically. *Pitman on Surety* 161. A remittance by an officer who, during his term, has given a new bond, with new sureties, made by him thereafter in the regular course of business, and of funds collected by him in his official capacity, without any directions how the

money shall be applied, will justify such an inference. *Stone* v. *Seymour*, 15 *Wend.* 19. In United States *v.* Eckford, Myers *v.* United States, and United States *v.* Linn, it expressly appears that the moneys in controversy were so remitted by the officer in the regular course of his duties, and were paid over without any special direction as to their disposition, and it must be assumed that in the other cases the remittances were of the same nature; for the right of the government to make its own application of moneys paid by its defaulting officer, out of his own funds, in default of an appropriation by him, is affirmed in United States *v.* Giles, and is nowhere denied. Under such circumstances it may be urged with a great show of reason, that the officer making his remittances regularly, in the course of his official duties, without doing any act to divert the funds from their legitimate objects, has done nothing in violation of his duties for which his sureties should be held. But the state relies on no such default to fix the liability of these defendants. The proof is, that Sooy, by his own act, diverted the funds received to a purpose for which they were not received, in disregard of his official duty. The cases cited, in whatever aspect they may be presented, do not touch the real question involved in this case.

On the other hand, it was the opinion of Mr. Justice Story, that a contest between two sets of sureties on official bonds made to the government, with respect to the application of payments by their common principal, was to be decided upon the same principles that govern between private individuals. *Postmaster General* v. *Furber*, 4 *Mason* 333. This opinion was deliberately formed after a review and examination of the case of United States *v.* January, and a re-statement of what was there decided by the Supreme Court of the United States, and was repeated in the subsequent case of *United States* v. *Wardwell*, 5 *Mason* 82. A case decided in New York, reported in the Supreme Court, under the name of *Seymour* v. *Van Slyck*, 8 *Wend.* 403, and in the Court of Errors, under the name of *Stone* v. *Seymour*, 15 *Wend.* 19, is

directly in point. The action was on a collector's bond, given by Van Slyck, with sureties, and dated June 1st, 1825. He was a defaulter when the bond was made. On the 22d of July, 1825, he made a remittance of $12,571.54. No express directions were given by him as to its application. It was credited on the books of the comptroller on the general account, and was applied as a credit on tolls received by Van Slyck in the month of May, 1825, before the bond in question was given. The sureties contended that the payment should be applied towards the tolls received after they became sureties, especially as the payment was made, as they alleged, out of moneys collected for tolls after they became sureties. But the court denied their claim, holding (Sutherland, J., delivering the opinion) that there was evidence to justify the jury in finding that Van Slyck intended this payment to be applied on the tolls received in the month of May, and independently of that, there was proof of such appropriation by the state at the time the payment was received, either of which conclusions would defeat the claim of the sureties. The affirmance in the Court of Errors was on the ground that Van Slyck intended the remittance in question should be applied to the tolls of the month preceding the giving of the bond. This case is important in that, both in the Supreme Court and Court of Errors, it was decided that payments by an officer of the government might be applied, as against his sureties, in extinguishment of defalcations existing previous to the accruing of the liability of the sureties, although the payments thus appropriated arose from tolls collected after their liability commenced; and that where there are several sets of sureties, each set is entitled to the benefit of moneys received during their respective suretyships, only where the parties have not, either expressly or by a necessary implication, made an application of the payments. In *State* v. *Smith*, 26 *Missouri* 226, in an action on the official bond of a collector who had served two successive terms, with different sureties on his official bonds, and who, in making payments to the county treasurer, during his second term, appropriated moneys derived from

the revenues of the second term, to the extinguishment of liabilities incurred by him during his first official term, it was held that the misapplication was binding on his sureties, if the county treasurer received the money in good faith. In *Inhabitants of Sandwich* v. *Fish et al.*, 2 *Gray* 298, the action was against Fish, a collector of taxes, as principal, and the other defendants as sureties on his official bonds for the years 1847, 1848, 1849 and 1850. The payments made to the town by the collector, during these four years, exceeded the tax-bills of those years. Fish had been collector before 1847, and the practice had been to state the accounts yearly, and to transfer the balance to the new account. In the account for 1847, a balance of $4,942.58 was transferred from the account for the previous year, which was before the defendants became sureties. The court held that payments made during the time these bonds run, should be applied to the prior indebtedness of the collector, though such application imposed a liability upon the sureties which otherwise would not exist, and made the collector in arrear for those years during which remittances had been promptly made.

The decisions of the English courts are to the same effect. In *Attorney-General* v. *Manderson*, 12 *Jur.* 383, the suit was against the defendant as surety for one Grignon, a collector of duties, on a bond dated the 16th of May, 1842. Grignon had been collector for the preceding years of 1838, 1839, 1840, and 1841, and was in default for the years 1838, 1840, and 1841, in £4448 15s. 6d. On the 23d of August, 1842, Grignon transmitted to the receiver-general £5000, which, it was proved, had been collected upon the assessment rolls of 1842. The court charged, "that if the jury was satisfied that the sum of £5000 had been remitted out of the taxes for 1842, and that Grignon had not expressly assented to the appropriation of that amount by the receiver-general towards the payment of the arrears of 1841, they should find for the defendant." On appeal, the judgment was reversed, for error in the charge, the court holding that there being a general right of appropriation in the receiver-general, he had a right

to appropriate the payment to any item, without any subsequent assent by Grignon.

The most recent case in the English courts, is *Gwynne* v. *Burnell*, in the House of Lords, reported in 7 *Cl. & Fin.* 572. A report of the same case in the Exchequer Chamber, will be found in 2 *Bing. N. C.* 7, and in the Court of Common Pleas, in 9 *Bing.* 544, under the title of *Collins* v. *Gwynne.* The action was in debt, on a bond, entered into by the defendant as surety for one Bigg, a collector of taxes for the year 1828, ending April 5th, 1829. The jury, as a special verdict, found that Bigg had paid over to the receiver-general all the sums received by him for assessments for the years 1828–9, but that he did not pay in all such sums to the service of that year, the sum of £2430, only, having been paid by Bigg to the service of that year, and £6093, the residue of the sums so received, having been expressly paid by him to the service of former years, for which he had also been collector, but the defendant had not been his surety during those former years. The case was heard in the Common Pleas, on the special verdict, before a full court, and in the Exchequer Chamber before seven judges. In the House of Lords, nine judges attended, and delivered opinions, and the decision was by Lord Brougham and Lord Chancellor Cottenham. On the point for which this case is cited, there was a concurrence of all the judges, comprising almost the entire judicial force of England. The argument of the counsel of the surety was, that enough having been collected and paid in by Bigg, during the year, to exempt the surety from all liability in respect of his bond, Bigg could not, by paying in, nor could the commissioners, by receiving payment of sums collected in that year, but assigned, by direction of Bigg, to the account of a different year, impose upon the surety a liability which he had never undertaken to incur. But the judgment of the courts was, that the breach of the condition of the bond was complete, and the surety was liable, though all the moneys collected in the year for which he was surety, were, in fact, paid in, if any part of them was appropriated by the

collector and received by the commissioners, in satisfaction of the arrears of a former year, and that an action would lie against the surety for the year in which the money collected had been so misappropriated. 7 *Cl. & Fin.* 572.

It was argued that the decision in Gwynne *v.* Burnell was not applicable to this case, for the reason that the condition of the bond was special, and different from the condition of the defendant's bond. I fail to see the force of this argument. The condition is printed on page 590 of the report, in *Cl. & Fin.* The clause chiefly adverted to by the judges, in their opinions was, " that he should well and truly pay, or cause to be paid, unto the receiver-general of the taxes, rates, and duties for the said county of E., all such sum and sums of money as shall come to the hands of A. B., as such collector, upon the days and at the times by the said acts appointed for the payment thereof, and according to the true intent and meaning of the said acts." It appeared in the case, that the collector did pay to the receiver-general all sums of money collected by him for that year, at the proper days and times mentioned in the condition, and appointed by the acts of parliament for the payment thereof. The breach relied on was, that he applied them in making payments in satisfaction of arrears due from him in former years, instead of paying them on the account of which they were collected, as he should have done in the performance of official duty. Bearing in mind that the subject of discussion is the power of a collecting officer to apply the proceeds of his collections to the payment of former arrears, and to impose a liability on his sureties for a deficiency arising from such wrongful appropriation, this case is a direct authority, squarely on the matter in controversy. Payment in extinguishment of former arrearages was declared, by the judges, to be as much a breach of duty and a forfeiture of the bond, as if it had been made " to pay any other debt, contracted at any other time or in any other manner," or "on any private account, to the receiver-general, or to any other person," or " as if the money had been lost at the gaming table." Baron Parke

said that the condition was to be construed precisely as if another person had been collector for the former year, and that the payment to the account of the wrong year was, in effect, an appropriation of the money, by the collector, to the payment of his own debt.

The condition of the defendant's bond (*inter alia*) is, that the treasurer shall well, honestly, and faithfully perform all the duties of his office. Some of the duties of the office are specifically prescribed by statute; others result from the nature of the office and the duties incident thereto. The treasurer is alone authorized to receive the moneys due the state, and he is the sole official custodian of the public funds. As treasurer, he is under a duty to refrain from the waste, embezzlement, and improper appropriations of the moneys of the state, as well as to answer for the waste, embezzlement, and improper appropriation by those employed by him, and is also under an obligation to keep the public moneys, and deliver to his successor such of them as have come to his hands, and have not been drawn from the treasury in the manner and with the vouchers prescribed by law. To secure the performance of these duties, the particular requirements of the statute, with respect to the manner in which the treasurer should receive, account for, and keep the public moneys, were designed.

The conduct of Sooy, throughout the whole of these transactions, was in flagrant disregard of his official duties. The taxes received by him were due the state under the act relating to transit duties, (*Laws*, 1869, *p.* 226,) and were payable in quarterly payments, on the last days of March, June, September, and December, in each year, and should have been received only on receipts countersigned by the comptroller. They were received by Sooy in instalments, in anticipation of quarterly payments not yet matured, and without the concurrence of the comptroller. The moneys received in April, May, and June, and described as the taxes due for those months, were received in anticipation of the quarterly instalment to become payable on the 30th of June, and

the payments of July 8th and 19th, and August 14th, were received on account of, and in anticipation of the tax to become due on the 30th of September. These sums were received at times not contemplated by the act of 1869, and without the voucher prescribed by law. The entries of such receipts in the official books of the treasurer, which he was required by law to keep, were falsified, and such false entries were reported to the comptroller for audit and registry. These moneys he used for the payment of what the law regards as a personal debt; and when he is called upon to pay over his collections to his successor, he is unable to respond. If, from the sum of all these misdeeds, a breach of his official bond is not made apparent, the public can place little reliance on the security taken for the honest and faithful performance of official duties.

We think that the defendants, as sureties, are liable for all the moneys received after their bond was given, and that they cannot relieve themselves from this liability by showing that their principal used such moneys, or a portion thereof, to satisfy past delinquencies to the state. To permit the acts of the treasurer in that respect, to have the effect of an exoneration of his sureties from responsibility, would, under the circumstances of this case, be to allow them to make a shield and defence of the fraudulent conduct of an officer whose honest and faithful discharge of the duties of his office they had guaranteed.

Judgment should be entered on the special verdict, in favor of the state, for the sum of $44,116.64, with interest from October 25th, 1875.