JOSEPHUS SOOY, JR., ET AL. v. STATE OF NEW JERSEY.

1. The statute approved March 27th, 1874, (*Rev., p.* 1216,) was not applicable to a state treasurer then in office and holding over because of failure to appoint his successor.
2. A bond for the faithful performance of official duty, given to the state by a treasurer so holding over, and sureties, on the demand of the two houses of the legislature, declaring that, if it was not given, they would appoint his successor, is not vitiated by duress, but is valid as the voluntary act of the obligors.
3. Such a bond need not be executed before the president of the senate, nor be approved by the legislature.
4. A receipt for moneys of the state, paid by the state's debtor to the state treasurer, signed by that officer, but not countersigned by the state comptroller, is competent evidence on behalf of the state to charge the treasurer and his sureties with the money so received.
5. The treasurer and his sureties are chargeable with moneys collected by the treasurer in advance, which fell due during the incumbency of the same treasurer and the period for which the sureties were responsible.
6. In the absence of statutory provision to that effect, neither the legislature nor its members are agents of the state for the reception of bonds or other contracts which impose no obligations upon the state and impair none of its rights.
7. In a matter wherein the legislature properly acts as agent of the state, notice to the members of the legislature individually is not notice to the state; such notice, to bind the state, must be given to one of the legislative branches in organized session.

8. The knowledge of the agent is chargeable upon his principal when-ever the principal, if acting for himself, would have received notice of the matters known to the agent.

9. In an action by the state upon a state treasurer's bond, the obligors can be held responsible for moneys received officially by the treasurer during the period covered by the bond, and applied by him to the satisfaction of defalcations which he had committed before that period, the state having received the moneys without knowledge of the mis-application.

10. Cotemporaneous entries made by the treasurer in his official books, and his returns to the state comptroller registered in the latter's books, showing the application of moneys delivered by the treasurer into the state treasury, are conclusive evidence against the treasurer and his sureties.

In error to the Supreme Court. For opinions of the Supreme Court, see 9 *Vroom* 324, and 10 *Vroom* 135, 539.

For the plaintiffs in error, *C. Parker* and *A. Browning*.

For the defendant in error, *B. Gummere*.

The opinion of the court was delivered by

DIXON, J. This writ of error brings up the proceedings of the Supreme Court in a suit by the state on a bond of Josephus Sooy, Jr., formerly state treasurer, and his sureties.

The first and second alleged errors lie in the striking out of the second and third pleas, pursuant to the opinion of the Supreme Court, on demurrer, as reported in 9 *Vroom* 324. It was there decided that the statute approved March 27th, 1874, (*Rev.*, *p.* 1216,) directing the treasurer of the state to give bond before entering upon the duties of his office, did not apply to a treasurer already in office and holding over because of the failure to appoint his successor; that the bond in suit was not required by any law, but was the voluntary act of the obligors, and as such binding upon them; that a demand by the two houses of the legislature that Sooy should give the bond or they would appoint his successor, as was their constitutional duty, did not constitute duress at all affect-ing the obligation; and that the want of execution of the

bond before the president of the senate, and its non-approval by the legislature, were also unimportant. We think the results reached on these pleas were correct, and no attempt need be made to give other reasons than are embodied in the opinion cited.

The next allegation of error is based upon the admission in evidence, at the trial, of certain receipts, signed by the said treasurer, for moneys paid to him by the Pennsylvania Railroad Company in advance, on account of taxes thereafter falling due to the state. The objections to these receipts were two-fold : that they were not countersigned by the comptroller, and that the moneys for which they were given were not due at their date. The first objection was rested on the sixth section of the act creating the office of comptroller, (*Rev.*, *p.* 1217,) which provides that the comptroller shall countersign all receipts for money paid to the treasurer, and no receipts shall be evidence of payment unless so countersigned. The plain design of this enactment is the protection of the state. It aims to induce the state's debtors, when paying their debts, and of course seeking written evidence of payment, to require such receipt as will convey to the comptroller knowledge of the payment, and so provide for the state a check upon the treasurer. But it does not avoid payments made by those who omit to obtain legal vouchers; it simply imposes on them the burden of proving the payment in some other method. Nor does it restrict the authority of the treasurer to the receipt of moneys so evinced. His general agency for the collection of all moneys of the state remains unimpaired by the neglect of any prescribed formality. The act is merely a rule of evidence between the state and its debtor. It cannot be invoked against the state by its delinquent officer. It was never intended to shield the treasurer, by preventing his written declarations from being used to charge him with money received, because they were not endorsed by the comptroller, or by relieving him from accountability to his principal for what his principal had directed him to do, because he had chosen to ignore some instructions as to the mode of

doing it. The second objection, that the money was not due at the time of payment, is equally unavailing. It became due during the incumbency of the officer, and during the period for which these sureties had assumed responsibility for his conduct, and therefore, plainly, his authority and their liability extended to its collection. The precise time of payment was a matter for the treasurer and the debtor.

The next assignments of error relate to the overruling of several questions put by the defendants at the trial to Levi French. This witness was a member of the general assembly at the session of 1875, when the bond in suit was presented to the legislature for approval, and was also a member of a committee of the house to which the bond was referred, "with power to examine, under oath, the parties signing said bond, and to ascertain the present condition of the state treasury, and the management thereof since February 1st, 1873, and make all necessary examination under oath, and report thereon as soon as possible." This committee had reported that the bond was sufficient, and they advised its approval, and that "their pressing duties unfit members in this house, and the great amount of work required, has decided it to determine not to undertake to ascertain the present condition of the state treasury." These facts appearing, the witness was asked, "Were you and other members possessed of information respecting the official standing and character of Josephus Sooy, Jr.?" and having answered, "I cannot say if it was information; I had the general impression among the members of the legislature;" was then asked, "An impression to what effect?" and the question was overruled. The following questions were then put to him: "Did you derive any information from Mr. E. J. Anderson, clerk in the comptroller's office, before the approval of the bond in question, as to the financial conduct of Mr. Sooy as state treasurer?" "Did you not, as a member of that committee, by reason of information which you were led to believe was in possession of Mr. E. J. Anderson, as to the financial conduct and condition of Mr. Sooy as state treasurer, propose,

prior to the approval of the bond, that Mr. Anderson should be brought before the committee to testify?" "Did you, from any source, prior to the acceptance of that bond, acquire information that Mr. Sooy had been guilty of irregularities or dishonesty as state treasurer—if yea, state the source and the information you acquired?" which questions were severally overruled. These interrogatories were propounded with the view of sustaining the plea of the sureties, to the effect that before the giving of the bond in suit, Sooy, their principal, being state treasurer, had been guilty of negligence in the discharge of his duties, and of embezzlement and defalcation in his office, and this conduct was known to the state, but was not disclosed by the state to the sureties, and hence the bond was invalid, being obtained by a suppression of the truth, equivalent to fraud. The immediate object of the inquiries was to prove knowledge of the state by notice to its agents.

In testing the legality of this offered proof, the first point to be settled is whether the witness was an agent of the state for the reception of such notice. We have already reached the conclusion that this bond was provided for by no statute, but was the voluntary act of the obligors; and therefore the question becomes a general one, whether a member of the legislature is the agent of the state to receive notice of facts which, if communicated to the state, would invalidate a bond delivered to the state. I know of no legal rule which could lead to an affirmative answer to this inquiry. Unless so made by specific enactment, neither the members of the legislature nor the legislature itself is the agent of the state for the reception of bonds or other contracts. Such an act, where the instrument imposes no obligations upon the state, and impairs none of its rights, but is wholly for its advantage, is purely ministerial, and pertains to the executive department of the government. The legislature has no concern with it, and in no sense represents the state in the transaction. But even if the statutes relating to treasurers' bonds were applicable to this obligation, and they required not merely the sufficiency of the sureties to be approved, but the bond itself to be accepted by

the legislature, still, in my judgment, the evidence offered would have been properly rejected. For, while the cases are not at one as to the effect upon the corporation of notice to the individual members of an aggregate body authorized to act as the agent of the corporation, yet I think that, from the very nature of the relations subsisting between the members, the body and the corporation, the insufficiency of such notice to charge the principal is fairly deducible. The fundamental idea is that notice to the agent is notice to the principal. But the members, even all of them, taken separately, are not agents of the corporation. An act assented to by every one of them is not a corporate act, unless, at the time of assent, they are convened in organized form. As the corporation incurs no liability by the acts of the individual members, why should it be involved by their neglect? It reposes no trust or authority in them, save when regularly assembled, nor holds them out as charged with any power or duty on its behalf. Such a view of this question seems to be supported by the better reason, even in regard to private corporations. *Ang. & Ames on Corp.*, §§ 307, 308 ; *Story on Agency*, §§ 140 *b*, 140 *c.·*

But in the case of members of public bodies representing governmental corporations, important considerations of policy appear to strengthen the opinion thus entertained. These functionaries are frequently selected from other considerations than their special fitness for their positions ; their active term of office is generally short, and their interest in the commonwealth is usually not greater than that of the other citizens. Then, too, they are ordinarily not chosen by the corporation at large, or its responsible managers, but by detached portions of it, who may or may not feel concerned for the general good. Hence the scope of the authority of governmental agents is wisely restricted to the narrowest reasonable compass. *Lee* v. *Munroe*, 7 *Cranch* 366.

The notice, to be equivalent to notice to the state, should have been given to the senate or general assembly in session, which alone would be the agents of the state.

But even conceding the efficacy of the knowledge of the witness, under certain circumstances, to bind the state, there is, in my judgment, yet another rule which condemns the excluded questions. This is, that the notice must come to the agent while he is concerned for the principal, and in the course of the same transaction, and if he have notice only by some other transaction, foreign to the business in hand, this will not affect the principal. 2 *Livermore on Agency* 237 ; *Dunlap's Paley's Agency* 263, note; *Wade on Notice*, §§ 672, 688 ; *Story on Agency*, § 140.

Although this rule is generally supported by judicial authority, yet it is not universally adopted. Most respectable courts have held that if it appear that notice, given to an agent prior to his agency, or in another transaction, is in the mind of the agent while acting for the principal, and is such as the agent is at liberty to communicate to the principal, the latter will be bound by it. *Hart* v. *Farmers and Mechanics Bank*, 33 *Vt.* 252; *Dresser* v. *Norwood*, 17 *C. B.* (*N. S.*) 466 ; *The Distilled Spirits*, 11 *Wall.* 356.

Such a doctrine is plainly deducible from what is said, in the case last mentioned, to be the underlying principle, a presumption of law that the agent communicates to his principal the knowledge which he has respecting the subject matter of negotiation. But I do not see why there should be such a legal presumption. It is ordinarily contrary to the fact and to the possibilities of the case. It may frequently promote injustice, by placing on the principal burdens which he never thought of assuming, and which the person dealing with him did not intend to impose. It may put the principal in a worse position, and the other party in a better position, than they would have held if negotiating together immediately. The more just principle would seem to be one that aimed to award to each the benefits and burdens which would have arisen if the business had been transacted by both in person. Such a result would follow if the rule to be adopted were that whenever the principal, if acting in the matter for himself, would have received the notice, the knowledge of his

agent shall be chargeable to him. This would ordinarily restrict the binding force of the agent's knowledge to those cases where it was acquired in the transaction of his principal's affairs; but it would also include the case, (which was that of *Hart* v. *Farmers and Mechanics Bank, ubi supra*,) where the party relying upon the notice refrained from giving the agent express notice, because he knew that the agent was already aware of the facts, and also the case, (which was that of *Dresser* v. *Norwood, ubi supra*,) where the third party contracted with the agent on the basis of the facts known to the latter. In both these cases it was fair to assume that express notice would have been given if it had not been known to be unnecessary. But if the principal, or an agent ignorant at the time of his employment of the fact with notice of which it is sought to charge the principal, would not have been apprised of that fact, I do not perceive why third parties should acquire any unexpected rights against the principal from the mere knowledge of an agent not communicated to him, even supposing the agent's duty to his principal required the disclosure to him of that knowledge.

Under the rule thus stated, none of the questions overruled was legal, because none of them was restricted to notice or information received by the witness while he was engaged in any official duty as representative of the state, and consequently they were all calculated to draw out evidence not pertinent to the point of investigation. The examiner was bound to so frame his interrogatories as to exclude the probability of irrelevant testimony.

The last assignment of error to be considered relates to the *quantum* of damages adjudged by the Supreme Court to be recoverable under this bond according to the special verdict. These damages were assessed upon the theory that the treasurer had the power of applying the moneys, received by him officially after the bond was given, to the satisfaction of defalcations committed by him as treasurer before that period, the state having no knowledge of his purpose of misappropriation; and that entries made in his official books under his

Sooy v. State.

direction, and his official returns to the comptroller, registered by the comptroller in his books, showing such application, were conclusive upon the treasurer and his sureties.   Both of these positions seem to us to be well founded, and they require no further support than the opinion of the Supreme Court discloses.   See 10 *Vroom* 539.   The first principle has been very recently acted upon in *Inhabitants of Egremont* v. *Benjamin*, 125 *Mass.* 15, where it is regarded as settled that if an officer applies moneys received during the term covered by the bond, to the payment of arrearages of a previous term, and the corporation whose servant he is, receive such moneys in good faith, without knowledge of any purpose on his part to defraud the sureties on his bond, such sureties are liable for the deficiency in the funds of the year covered by the bond, which results from such application of the moneys received.

It was strenuously insisted against the second rule adopted that the entries are mere false book keeping, and the facts being now made plain, those entries work no actual injury to the state, and justify only nominal damages upon the bond. But we do not so regard them.   They are the cotemporaneous declarations by the officer paying, and by the state receiving, of the account on which payment is made.   They are not the statement of what had been done between the original debtor and the state's agent; but they were the characteristic concomitants of the transaction between the agent and his principal, not to be contravened as proof, except as the transaction itself might be repudiated by a party having the right of repudiation.   That right certainly does not belong to the treasurer or those who have vouched for the integrity of his conduct.

We find no error in the cause, and the judgment should be affirmed.

*For affirmance*—THE CHANCELLOR, DALRIMPLE, DIXON, REED, CLEMENT, DODD, GREEN, LATHROP, LILLY.   9.

*For reversal*—None.