Defendant Stout contracted with defendant board of education to build a public school house at Middlebush, for $72,185. He gave bond to the board in this sum, with defendant Metropolitan Casualty Insurance Company as surety thereon, for the faithful performance of the work and the payment of all subcontractors, materialmen and laborers, substantially in accordance with the provisions of P.L. 1918 ch. 175 p. 203.
Complainants furnished the lumber and mason materials for the price of $6,890.53. On October 20th, 1926, they filed notice of lien claim for this amount, and thereafter filed their bill in this cause against the contractor and the board, to enforce such lien claim, under section 8 of the Municipal Lien act (Revision 1918).
One or two subsequent lien claimants later applied and were made parties to this suit, also the defendant insurance company.
Stout abandoned the contract about November 15th, and the insurance company, as surety, took it over. The board of education had still in its hands over $50,000 of the contract price. On December 20th the insurance company contracted with the Perth Amboy Construction Company to finish the job for some $53,000 — the latter to use, and the insurance company to pay for, the materials theretofore delivered on the job, including complainants' lumber, c.
About September 27th, the board had made a payment of $10,494.04 to Stout on account of the contract, and on September 28th Stout had paid to complainants, out of the funds so received, $8,000. Stout was already indebted to complainants to the amount of $30,000 on open account, in addition to the indebtedness on this Middlebush school job, and complainants applied this payment of $8,000 on account of that prior indebtedness. About October 30th, the board paid another sum of over $10,000 to Stout on account of this contract, out of which Stout paid $6,000 to complainants, who applied it also to the open acount.
The contract was duly completed and accepted. The other lien claimants have been paid. The fund in the hands of *Page 417 
the board should be paid to the insurance company, less the claim of complainant for the $6,890.53, if that claim be valid.
The insurance company contends that the complainants' lien claim must be deemed to have been paid out of the moneys received from Stout in September, inasmuch as complainants knew that Stout was making this payment out of moneys received by Stout from the board on account of the very building contract for which the insurance company was surety. (The insurance company's contract was one of guaranty in the nature of suretyship — the insurance company will hereinafter be called the surety company.)
Admittedly the question is of novel impression in New Jersey. It has been considered in a number of cases cited by the defendant surety company, decided in some of the western states, and it seems that the weight in number of those decisions is to the effect that complainants, under the circumstances of this case, were equitably bound to apply the September payment to the debt due on the school building, since they knew that the payment came from moneys received on the school building contract, although in the absence of such knowledge complainants would not have been under such duty.
The difficulty in the way of accepting these adjudications as authoritative is that they assume, without proving, that such an equity exists in favor of the surety.
As between debtor and creditor it is the debtor's legal right to direct that any payment he makes shall be applied to whichever of two or more debts he chooses; equally it is the creditor's legal right to select the application if the debtor fails to do so at the time of payment. Terhune v. Colton, 12 N.J. Eq. 232
(at p. 237); affirmed, Ibid. 312 (at p. 320). These two rules of law are well established not only in New Jersey but generally. See tit. "Payment," 30 Cyc. 1228 et seq.;21 R.C.L. 88 et seq.
It is also well established that these two principles are equally the law, as a general rule, notwithstanding that there be a surety for one of the debts. Like all rules there are *Page 418 
some exceptions to it, but as a general rule a surety has no right to insist that a debtor shall pay the debt guaranteed by the surety instead of an unsecured debt; nor has he a right, where the debtor makes a payment to a creditor without direction as to which debt is to be credited, to insist that the creditor apply the payment to the secured debt instead of the unsecured debt. 30 Cyc. 1234; 21 R.C.L. 108; 32 Cyc. 170, tit. "Principaland Surety;" 28 C.J. 1005, tit. "Guaranty; Pingrey, Suretyshipand Guaranty" § 97; Stearns, Suretyship (3d ed.) § 96 p.134; Wilcox v. Fairhaven Bank, 89 Mass. 270 (at p. 274).
This general rule is quite logical. A surety is a contingent creditor. If and when he pays the debt which he has guaranteed, he becomes a creditor and stands in the shoes of the creditor whom he paid; but he has no greater rights, and there is no reason why he should have. As between two ordinary creditors neither one has a greater right than the other to insist on his debt being paid — a debtor has a right recognized in equity as well as at law to prefer a creditor, except to the extent that bankruptcy statutes interfere. So, assuredly, a contingent creditor would have no greater right than an actual creditor.
As has been said, there are exceptions to this general rule. They are variously stated in the different opinions and texts, but it is conceived that they are not susceptible of classification under any principles other than this — that where circumstances exist such as give rise to superior equities in favor of the surety, the legal rights of the debtor and creditor, above stated, will be subordinated to such rights of the surety. In other words, they are not legal exceptions to a legal rule, but cases where equitable rights arise to override legal rights.
For instance it is said by some of the authorities that where the money which is paid to the creditor is the very money for the payment of which a surety is surety, the surety has the right to insist that the payment shall be applied to that debt instead of to another indebtedness, and Merchants Insurance Co. v.Herber, 68 Minn. 420, is cited. In thase case Herber was an agent of the insurance company, and under his contract *Page 419 
was to collect premiums, which were the property of the insurance company, and remit them to the company. A surety gave bond for the faithful performance by the agent of his duties. The first month, the moneys collected by the agent and remitted to the company were by the agreement of both applied to the discharge of a prior indebtedness of the agent to the company, on which the surety was not liable; the next month's collections were applied to the indebtedness due the first month, and so on, leaving an unpaid balance at the end of the agency, although in fact the agent had remitted to the company all the moneys he had collected during the term for which the surety was liable. The court determined and rightly so, that the surety was not liable for the unpaid balance due to the company from the agent; the court says that the surety was equitably entitled, so far as his liability was concerned, to have the remittances by the agent applied so as to extinguish the surety's liability. It would seem, however, that no equitable principles were really involved; the surety was discharged on pure legal principles, the agent had, in fact, done that which the surety had bound himself that the agent should do, namely, to remit to the company all moneys of the company collected by him during the year of his agency.
It seems to be upon this so-called principle of the surety's right to direct the application of the payment of the very money for the payment of which he is liable, that the western states reach their result in the cases similar to the case now subjudice. Let us see whether the circumstances are analogous to the Minnesota Case, or whether, under the circumstances of the present case, the surety has an equitable right superior to the legal right of the creditor.
It is conceded by all that if the payment made by Stout to the materialman lien claimant had been made out of Stout's own money — say out of a legacy received by him — the surety would have no right to insist that the payment should be applied to the debt on the Middlebush school for which it was surety. In fact, it was made out of moneys received by Stout from the school board, as a payment due him under his contract. *Page 420 
But the moment the money was paid over to Stout by the board, it became and was his own money — money which he had legally earned and which belonged to him alone, just as much as any other money he could have. It was not the money of the lien claimant, hence the case is not like the Minnesota Case. Neither was it the money of the board, or of the surety company. Stout had made no assignment to the surety company. (There is a clause in Stout's agreement or application for the bond, which purports to operate as an assignment by Stout to the surety company, in the event of a breach or default by Stout of all moneys then in the hands of the board due or to become due to Stout under the contract — but at the time of the payment by Stout to the lien claimant Stout had not defaulted on the contract.)
Not only was it Stout's own money, but there is nothing in the case from which this court can find that the surety company had any right or interest therein. Stout had made no promise or agreement either to the board or to the surety company, or to the materialman, that he would apply moneys received by him from the board primarily to the satisfaction of claims of laborers and materialmen on the Middlebush school job. Neither is there any provision in the Mechanics' Lien act (Municipal Mechanics' Lien act — Revision 1918, page 1041), or in the statute under which the surety bond was given (P.L. 1918 p. 203), nor in any other statute to which the attention of the court has been directed, requiring either the contractor or the contractor's creditors to make such primary application of moneys received by the contractor on his contract — nothing either expressed or arising by necessary implication.
All this being so, how can this court read into the statute a provision which the legislature has not enacted; or upon what grounds can the court say that natural justice or equity requires a judicial extension of legal or equitable principles so as to accomplish that result for the benefit of the surety?
It is conceded by the surety company, and by most, if not all, of the authorities upon which it relies — indeed no contention has ever been made to the contrary by any court or text writer so far as this court is aware — that the moneys *Page 421 
received by Stout from the board are so far Stout's own money, unencumbered by any rights of others, that he could use such moneys to pay creditors who were entire strangers to the school house contract, even though such creditors knew the source of the moneys paid to them, and that the surety could not be heard to complain. This admission, it would seem, is fatal to the maintenance of the surety's claim; for if either the board or the surety company had any equitable right in the moneys, after they were paid by the board to Stout, to require Stout to pay or distribute such moneys in liquidating debts which he owed for labor or materials on the school house contract, it would be just as much of a wrong for Stout to use it in paying an antecedent debt to a stranger as to use it in paying an antecedent debt to the present lien claimant. Conversely, if Stout, by using the money to pay an antecedent debt to a stranger would not violate the alleged equitable right of the board or of the surety company, he could not violate such alleged right by paying an antecedent debt to the lien claimant. A right which could be violated in the one instance and not in the other (unless it be created by statute or arise out of some special contract or dealings between Stout and the board or the surety company), is a right of a kind of which this court has no knowledge.
Indeed, we may go one step further. If this court had the power to create such a hybrid right, why should it exercise that power in the present instance? What sound argument is there for asking the court to read such a provision into the statutes, or to adjudicate that a special equity to that effect arises in favor of the surety company in the present case?
First, as to the contention which has been made in some instances, that even where no surety is involved, the contractor is bound to use the moneys received by him on the contract, in paying the debts incurred by him on the contract. It is not apparent why there should be any greater legal or equitable restriction placed upon a building contractor as to what he shall do with the money he earns and has paid to him, than would be the case in any other business of similar nature. If A, as purchaser, and B, as manufacturer, enter into a contract *Page 422 
for $100,000 worth of tires, it has never been contended that B should be required to utilize the payments he receives from A solely or primarily in paying for the cotton and rubber and labor used in the making of those particular tires.
Such a restriction, if it generally existed, would obviously be difficult of enforcement — would be productive of a great amount of litigation, and would impose an almost intolerable handicap to business.
It may be thought that the existence of the Mechanics' Lien statute destroys the analogy between the two cases — but why? That legislation was designed to benefit laborers and materialmen on building contracts but it was not intended to impose any undue hardship on the owner — nor does it. It does not make the owner liable for anything further than the contract price he agrees to pay — unless he disregards the provisions of the act. Under the Municipal Mechanics' Lien act the lien is given only on the unpaid funds remaining in the hands of the municipality — and so also in the General Mechanics' Lien act if the owner files his contract, the materialmen and laborers have no lien, and can acquire no rights to anything but the moneys remaining unpaid in the owner's hands.
Secondly, from the standpoint of a surety being involved. Here again it would be equally inadvisable to adopt such a restriction, generally, in all businesses — nor has any such contention been urged — nor is there any reason why it should be adopted. As has been seen, a surety is only a contingent creditor, and fundamentally is not entitled at most to any greater rights than an actual creditor, and no one creditor has any greater right to payment than any other. No one is compelled to become a surety — he does so voluntarily (either for or without compensation) and has it open to him to demand some special agreement or protection for himself, if he thinks best, before becoming surety.
What is there in the case of a building contract that should require any different rules?
It is true that the statute requires that a municipality shall require a contractor to furnish a bond to insure the payment of all laborers and materialmen, and further enables *Page 423 
such laborers and materialmen to recover from the surety who executes such bond, in the event they do not receive payment from the contractor or the municipality. This gives to the laborers and materialmen a right and an assurance of payment which they did not have prior to the statute, and it might not be unfair to them for the legislature to require of them that they apply all payments received by them out of moneys paid by the municipality on the particular contract to the liquidation of claims arising out of that contract. But the legislature has not done this so far, and it is not perceived that there is anything inequitable or contrary to natural justice to the sureties in this legislative omission. There is no legal or other compulsion on a surety company to enter into such surety bonds; when surety companies do so, they do so for compensation, and are at liberty to insist, as a condition to their becoming sureties, upon special agreements or arrangements for their protection. They might require for instance that the installments of contract price be paid by the municipality to the contractor and the surety jointly, so that the surety could control the application of such moneys. If the municipality or the contractor should refuse such an arrangement, the surety company need not go on the bond. If it does go on the bond, without any such arrangement, it does so as a matter of business and for the sake of the fairly high premiums exacted.
It is concluded therefore that in the instant case the lien claimant's claim has not been paid, and that the surety company has no legal or equitable right to insist that it must, so far as concerns the surety company, be deemed to have been paid.
Perhaps it should be said that some contention was made by the surety company, that the payment in question was not applied by the lien claimant to the antecedent debt. The proofs showed that it was so applied and credited on the creditor's books at the time it was received; the most that could be argued was that this was done by the bookkeeper without the special direction of any officer of the creditor company. But this would not be material; obviously such act *Page 424 
was the act of the company by its agent, and was accepted and thereby ratified by the company.
Moreover, even if there had been no application by the creditor, the result would be the same, for, of course, the antecedent debt was older than the lien claim debt, and under the law in this state, if a payment be made without application by either debtor or creditor, the law will direct its application either to the older debt or to an unsecured debt instead of a secured debt. Terhune v. Colton, 12 N.J. Eq. 232 (at p.238); Ibid. 312 (at p. 320).
It is also argued by the surety company that an express declaration by the debtor as to the application of the payment is not necessary; it is sufficient if the intent clearly appear from the circumstances. That is true, except that there must be some sufficient communication of that intent to the creditor.Terhune v. Colton, supra (at p. 237). There is no room for such an argument in the instant case, however, for the debtor (Stout) was called as a witness, and not only testified that he made no direction as to application of the payment, but did not even claim that he had had even an undisclosed intent that application should be made to the debt on the Middlebush school, or that he had ever had any objection to the application which was made by the creditor.
The lien claimant is entitled to decree for its lien claim; the surety company is entitled to the balance of the moneys in the hands of the board, under its right of subrogation to the rights of the contractor, having as surety performed the contractor's obligation, and having paid the other lien claimants. *Page 425