BOROUGH OF TOTOWA, A MUNICIPAL CORPORATION OF NEW JERSEY, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. AMERICAN SURETY COMPANY OF NEW YORK, A NEW YORK CORPORATION, DEFEND-ANT-RESPONDENT AND CROSS-APPELLANT.

Argued October 22 and 23, 1962—Decided February 18, 1963.

334

*Mr. Francis R. Giardiello* argued the cause for plaintiff-appellant and cross-respondent.

*Mr. W. Fletcher Hock, Jr.,* argued the cause for defendant-respondent and cross-appellant (*Mr. John W. Hand,* of counsel; *Messrs. Evans, Hand, Evans, Allabough and Amoresano,* attorneys).

The opinion of the court was delivered by

WEINTRAUB, C. J. This is an action by the Borough of Totowa against American Surety Company of New York upon official bonds executed as surety for Wilbur Henry Hawthorne, tax collector, treasurer, and water registrar of the Borough. The case was tried without a jury. Both parties appealed from the judgment. We certified the matter before the Appellate Division heard it.

The pertinent facts are stated in connection with each of the issues.

I.

The first issue concerns the application of certain payments made by Hawthorne to the Borough.

Hawthorne's peculations spanned an extensive period. Although defendant was surety throughout, it urged, and plaintiff did not disagree, that by reason of *N. J. S.* 2A:14–17 it

could be held only upon bonds dated within nine years of suit. *Waterford v. Maryland Casually Co.,* 119 *N. J. Eq.* 92 (*E. & A.* 1935). As to Hawthorne, however, the statute of limitations, *N. J. S.* 2A :14–4, permitted suit within 16 years after the accrual of the cause of action upon these same bonds signed by him as principal. Accordingly Hawthorne was liable for sums in excess of those for which the surety could be held.

The surety thus remained liable upon two bonds, one dated December 12, 1949, for the period 1950 through 1953, and the other for the following four years. During the probe of his official conduct, Hawthorne sent to the Borough two payments which equalled the shortages revealed to that point. The surety contended that Hawthorne directed the Borough to apply those payments to the shortages for which the surety was liable, whereas the Borough contended it had properly applied the payments to the earlier losses. The trial court found for the surety.

The decisive facts were presented wholly by a stipulation. From it we find that on September 23, 1955 the Mayor and Council received a letter report of an audit showing shortages, whereupon Hawthorne was suspended. The auditor's letter report of October 13, 1955 stated an analysis of "recorded cash receipts and deposits for the years 1952, 1953, 1954 and 1955 to September 26" showed a shortage of $13,492.48. It added that "A separate report will be rendered as to the situation with regard to our investigation of the other section of accounts, and as to whatever may turn up re: circularization."

The stipulation states the Borough advised Hawthorne's attorney that the audit revealed a shortage in the above amount during the stated period, whereupon the attorney sent the Borough a check in that sum with a letter saying that "it has been indicated to me  *  *  *  that an audit  *  *  *  shows a deficit of $13,492.48" and that:

"It is my understanding that a 100% circularization will be made of the taxpayers of the Borough of Totowa for at least the year of

1954. It is possible that further irregularities may come to light. These may result in an overage or a further increase of the present apparent deficiency. Please be advised that if there is any such overage we will expect to be credited therewith; but if there is an increase in the present apparent deficiency, my client stands willing and ready to supplement the present check with any necessary moneys to meet a further deficit.

Two cardinal principles are involved in the present controversy:

1. My client will not permit the taxpayers of the Borough or the Bonding Company to suffer any loss by reason of any irregularities during his incumbency of the office of Collector-Treasurer of the Borough of Totowa.

2. We will ask for and will expect to be granted the right to have auditors selected by us to check the accuracy of the statements that by reason of the time element we are perforce accepting as accurate. Incidental to the second point, no reflection is being cast upon the present auditor of the Borough; but prior statements as to the amount of total shortage are in such contrast to the amount supposedly found to be final, that my client feels he is entitled to this reservation of the right to check upon the examination made by the auditor until the audit presently being made is completed."

The Borough resolved that this check "be accepted, subject to the Auditor's final report," and that the attorney for Hawthorne be permitted to have the books examined by an independent auditor.

In May 1956 the Borough advised Hawthorne's attorney that the audit then showed a further shortage of $7,205.35. It is not clear whether the auditor's statement itself was sent to the attorney but that statement showed a total due of $20,747.83, less the payment of $13,492.48 referred to above and a $50 item of no immediate moment. The statement concluded, "Note this amount does not include any moneys due which may show up due to the circularization of outstanding delinquent items as of September 26, 1955." In response the attorney for Hawthorne sent a check for $7,205.-35, saying:

"It has been indicated to me, as attorney of Wilbur Hawthorne, former Collector-Treasurer of the Borough of Totowa, that a continuation of the audit of the books of the Borough as of the present date shows a further apparent discrepancy of $7,205.35. In keeping with the promise I made to you in my letter of November 14, 1955,

wherein I stated that if there was an increase in the then apparent deficiency my client stood willing and ready to supplement the check that he presented on that date with any necessary funds to meet a further deficit, I am turning over to you with this letter, a check of our firm's special account in the aforestated sum of $7,205.35."

Counsel again reserved the right of independent examination.

From the foregoing the trial court found the two payments were appropriated by Hawthorne to the losses in the years to which the audit report referred and thus reduced the surety's liability.

In so holding, the trial court expressed two thoughts. One was that to apply the payments to any year prior to 1950 would revive the surety's liability upon earlier bonds as to which the statute of limitations had run, and that such revival against a surety could not be accomplished by a payment by the principal. *Restatement of Security* § 120 (1941). As to this, we agree the surety could not be deprived of its defense by the principal's part payment, but the Borough's position does not depend upon the revival of the surety's liability upon earlier bonds. The Borough concedes the surety cannot thus be held; rather it contends the payments reduced Hawthorne's liability on the earlier bonds leaving the amount of the surety's liability upon the later bonds unaffected. We think the subject of revival of the surety's liability is not involved.

The correctness of the result therefore depends upon the second aspect of the trial court's approach, to wit, that Hawthorne had the right to apply the payments to such defalcations as he chose and in fact did apply the payments to the years mentioned in the audit statements.

The usual rules may be summarized as follows: A debtor may direct to which of several debts his payment shall be applied, and if the debtor does not manifest to his creditor his intention thus to apply, the creditor may apply it to his own advantage, such as to an unsecured debt rather than a secured one or to the oldest item. *Hickey v. First National Bank of Lyndhurst*, 110 *N. J. Eq.* 52 (*E. & A.* 1932) ; *Grover*

*v. Board of Education of Twp. of Franklin,* 102 *N. J. Eq.*
415, 417–418 *(Ch.* 1928), affirmed o. b. 104 *N. J. Eq.* 197
*(E. & A.* 1929) ; *State v. Sooy,* 39 *N. J. L.* 539, 545–546
*(Sup. Ct.* 1877), affirmed 41 *N. J. L.* 394 *(E. & A.* 1879) ;
6 *Williston, Contracts (rev. ed.* 1938) §§ 1795–99, *pp.* 5104–
15 ; Annot., 57 *A. L. R.* 2d 855, 859 (1958) ; *Restatement of
Security* § 142 (1941). A surety cannot complain that the
debtor's funds were appropriated by the debtor or the creditor
to a debt other than the one upon which the surety is bound,
but if either does apply the payment to such debt, the surety
cannot be deprived of its benefit by subsequent action of the
debtor or creditor or both. Annot., 57 *A. L. R.* 2d 855, 865
(1958). And if neither the debtor nor creditor applies the
payment, the court will apply it as justice requires, and,
according to the majority view in this country, will apply the
payment to the advantage of the creditor, and hence, in the
absence of supervening equities, to the oldest or to the least
secured item. *Long v. Republic Varnish Enamel & Lacquer
Co.,* 115 *N. J. Eq.* 212, 216–217 *(E. & A.* 1934) ; *Grover v.
Board of Education of Twp. of Franklin, supra* (102 *N. J.
Eq.,* at *p.* 424) ; *Naidech v. Hempfling,* 127 *N. J. L.* 430, 432
*(Sup. Ct.* 1941) ; 6 *Williston, Contracts (rev. ed.* 1938) §§
1800–01, *pp.* 5115–17; Annot., 57 *A. L. R.* 2d 855, 866
(1958).

The Borough contends the rule enabling a debtor to choose
should be limited to conventional obligations voluntarily
created, and that an embezzler should not be so privileged.
We need not decide that question for the reason that we can-
not find in the letters of Hawthorne's counsel the communica-
tion of an intent to apply the payments to any particular
phase of the total liability. On the contrary the letters treat
Hawthorne's obligation as a single account, the final amount
of which was unknown and was subject to adjustment as the
continuing audit on behalf of the Borough or an audit on
behalf of Hawthorne might require.

■ Hawthorne was scarcely of a mind to dictate the ap-
plication of his payments. He must have been a worried man,

eager to have the Borough accept the assurance stated in the letter that the taxpayers would suffer no loss and hopeful that that assurance and the payments made would obviate or lessen the penal sanctions which lay ahead. Nowhere do his attorney's letters suggest that his obligation consisted of multiple liabilities and that he was choosing to pay some particular ones. Hawthorne, who must have known that the preliminary figure did not approach the total, doubtless hoped the investigation would be incomplete. He would hardly say to the Borough that his shortages exceeded what the audit had thus far revealed and that he was deliberately paying the specific items uncovered rather than those not yet discovered. The only position he could sensibly take was that he would make good the losses whatever they were found to be and that his payments be accepted on account. We find no more in the letters. The Borough was accordingly correct in deeming the payments to have been unconditional and in applying them to items prior to 1950.

## II.

The next question is whether the surety is liable for losses arising out of false tax search certificates issued by Hawthorne. The surety's position, with which the trial court agreed, is that in issuing those certificates Hawthorne was not discharging a duty of any office within the coverage of the bonds.

The facts are these: Hawthorne was elected collector in 1941 and thereafter re-elected for successive terms running through the date of his resignation, November 14, 1955. Hawthorne also held two additional offices under resolutions of the Borough Council, the office of treasurer[1] being so held from 1941, and the office of water registrar from 1944. Each year, beginning in 1946, the Council also adopted a resolution that Hawthorne, "Collector-Treasurer of the Borough of

---

[1] *N. J. S. A.* 40:87–46 provides that the collector "shall act as treasurer" and hence the resolution seems to have been unnecessary.

Totowa, be named and designated as official Tax Search Officer of the Borough of Totowa." The surety stipulated that it knew of these annual designations of Hawthorne as "official Tax Search Officer" and further that it received a copy of such resolution in each of the years 1946 to 1949 inclusive. The bonds, however, never referred to "tax search officer," they referring only to the three offices mentioned above, *i. e.*, collector, treasurer, and water registrar.

We gather that Hawthorne's involvement became such that he could no longer rely upon the records of his office and hence, to avoid exposure, he issued certificates which incorrectly showed no municipal liens to be outstanding. Since *N. J. S. A.* 54:5-17 protected *bona fide* purchasers for value who relied upon the search, the Borough sustained losses as result of these erroneous certificates, above and beyond sums misappropriated by Hawthorne.

The surety contends the Legislature created the separate office of tax search officer and since the bonds did not mention that office, they did not cover Hawthorne's performance in it. 9 *Appleman, Insurance Law and Practice* § 5361, *pp.* 199–200 (1943). The Borough answers that the Legislature did not create an office but rather provided for a duty to be attached to another office to be selected by local government, and hence, when the governing body resolved that the collector-treasurer be the "tax search officer," it simply added a duty to an office fully covered by the bond.

We agree with the Borough's view of the statute. *R. S.* 54:5-11 reads:

"The governing body of each municipality shall from time to time, by resolution, *designate* a bonded official of the municipality to make examinations of its records as to unpaid municipal liens and to certify the result thereof. The official so designated, and each new incumbent of the office, shall thereafter be vested with the power to make official certificates of searches for municipal liens until a new official has been designated for the purpose, and no other official than the one so designated shall make any such official certificate." (Emphasis added.)

We note the use of "designate," rather than "appoint," a word which we would expect if a separate office were in mind. And we note the one to be designated is described as "a bonded official," which plainly embraces the incumbent of an existing office and indeed one whose performance is bonded. And the provision of the final sentence, that the power shall remain with the "official so designated, and each new incumbent of the office [*i. e.*, the office held by the official designated to search] * * * until a new official has been designated for the purpose," evidences the thought that the power is annexed to an existing office rather than to a new office created for that purpose.

The same thesis is evident in *R. S.* 54:5–18, which protects a purchaser "if the municipal clerk upon written demand shall fail within fifteen days to state the name and place of office of the official of the municipality duly designated to make tax searches." And we add that in providing for searches as to improvements authorized but not assessed, the Legislature used a parallel approach, providing in *N. J. S. A.* 54:5–18.3 that the governing body shall by resolution "designate the municipal clerk or municipal engineer as the person who shall make such certificates," thus clearly attaching the function to such of the named existing offices as the governing body should select.

The statute seemingly was so read in an incidental statement in *United States Mortgage Title & Guaranty Co. v. Teaneck,* 128 *N. J. L.* 114, 118 (*E. & A.* 1942). And *Padavano v. North Bergen,* 13 *N. J. Super.* 6 (*App. Div.* 1951), recognized that the governing body may assign the duty to an existing office. In that case it apparently was also assumed that a municipality could create an office or position to have the sole duty of searching. Whether that assumption is correct we need not consider, since here there was no pretense that a separate office was created, the resolution plainly designating an existing office to be the repository of the statutory duty.

This brings us to the question whether the bonds conditioned upon performance of "all the duties" of the offices of collector and treasurer covered the performance of the duty to search added by the resolution of the Borough. We think the issue is fairly controlled by *Van Valkenbergh v. Mayor, etc., of City of Paterson,* 47 *N. J. L.* 146 (*E. & A.* 1885). There the bond was conditioned upon performance of all the duties enjoined on the city clerk. The city's charter provided that for two years after its passage and until otherwise ordered by the board of aldermen, the city clerk for the time being should be register of licenses. The city clerk embezzled fees received as register of licenses. In holding the surety, the court said (at *p.* 147):

"\* \* \* Part of Hague's duties as city clerk was therefore the performance of those of the office of register of licenses. The sureties had notice from the charter itself that the duties of the latter office devolved upon the city clerk and were part of the duties of his office, and they therefore contracted that he would faithfully discharge the duties of the office of register of licenses. A surety upon an official bond must be held to have contracted with reference to the obligations devolved upon his principal by law."

The surety here seeks to avoid *Van Valkenbergh* on the distinction that there the duties devolved upon the specific office by operation of law, whereas here it was not the statute itself but rather the resolution of the Borough under the statute which selected the office held by Hawthorne for the performance of that duty. Whether this difference would be significant if the surety were unaware of the resolutions, we need not say. Here the surety concededly knew, and in fact it was stipulated that copies of the resolutions were sent to it in the years 1946 to 1949 inclusive and thus prior to the execution of the bonds here involved. Hence the surety, which may not deny it knew the statute required the governing body to designate some "bonded official" to search for municipal liens, knew also that the "bonded" official selected in compliance with the statute was the incumbent of the offices it had covered and continued to cover.

The surety refers us to the rule relating to the effect of a change in duties made after the issuance of an official bond. As to this topic, we find in *Stearns, Suretyship* (*5th ed. Elder* 1951) § 9.8, *p.* 310:

"It is the settled rule as to official bonds that they include liability not only for default in the performance of duties imposed by the law in force at the time of the execution of the bond, but also extend to all duties which may from time to time be added to the office by amendment to the law. This results from the essential distinction between a bond to secure a contract, and a bond to secure performance of a public duty. The latter does not relate to default in performance of contractual duties and is unaffected by the rules which protect sureties who undertake to indemnify against a breach of contract.

Sureties upon official bonds are held to contemplate a possible amendment to the law and to stipulate, by implication, to be responsible for the performance of all duty thus added. Such a rule is indispensable to the proper management of public affairs, the only limitation being that the new duties shall be of the same general character as those described by statute at the time of the execution of the bond."

*Restatement of Security* § 175 (1941) provides for liability as to the new duties unless they "are materially different in kind from the original duties, or unless they impose a substantially greater risk on the surety." Cases are discussed in Annot., 94 *A. L. R.* 613 (1935), wherein the thought appears that the new duties should be germane to the office and have some obvious relation to it.

Searching the very records maintained by the incumbent of an office would seem to be an appropriate function of that office. It is true, as defendant suggests, that if the searcher were another person, defalcations might incidentally be uncovered, but if the duty to search and to certify is otherwise germane, it does not become inappropriate merely because a check could be achieved by divorcing the functions. Government would be badly hampered if all duties were fragmented or parceled on the premise that public servants are likely to be dishonest.

At any rate, we need not further pursue the subject since there was no change in duties during the terms of the bonds here involved. The collector-treasurer was designated to search and certify long before the execution of these bonds, and the redesignations thereafter were unnecessary and of no consequence. *R. S.* 54:5–11 expressly provides that the official so designated "and each new incumbent of the office" (*i. e.*, here, tax collector and treasurer) shall be vested with the power "until a new official has been designated for the purpose." Since the duty was attached to Hawthorne's office before the bonds in question were executed, the cases dealing with a change in the duties of office during the term of a bond are not relevant. See *City of Rice Lake v. Jensen* (*United States Fidelity and Guaranty Co.*), 216 *Wis.* 1, 255 *N. W.* 130 (*Sup. Ct.* 1934), and Annot., *supra*, 94 *A. L. R.*, at *p.* 622.

Nor can we reach a different result because the surety argues it would have charged an additional premium if it had understood the duty in question to be within the coverage of the bonds. If that unsubstantiated claim were accepted, still the burden of the unilateral misunderstanding would remain with the surety, relievable at most by a right to such additional premium as prevailing practice might establish.

We conclude therefore that the surety is liable for the losses resulting from Hawthorne's false certifications.·

### III.

Following disclosure that Hawthorne was short, there was a special audit of the records of his office, circularization of taxpayers to verify arrearages shown on the books, and finally reconstruction of the records themselves. The Borough claims expenditures of $20,135.55.

The work was undertaken because Hawthorne's misconduct was believed to have destroyed the reliability of the records. The surety does not question the reasonableness of the Borough's decision to take these steps. Rather it denies

liability upon the ground that the expenses incurred also served to assist the Borough in prosecuting this litigation and for that reason should not be recoverable. The trial court concluded the surety was chargeable insofar as the expenses represented the costs of restoring the integrity of the official records but not as to the expenses which served to establish the amount of the Borough's claim on the bond. Both parties disagree with that disposition.

We are not prepared to say that expenses required to reveal the amount of an injury are not recoverable. If it is reasonable for the victim of an automobile accident to obtain an X-ray to determine the extent of the hurt, the cost is a proper element of damage notwithstanding that the X-ray serves also to advance his case in the courtroom. It may be doubted that an embezzler whose wrong can be measured only by an expensive inquiry can escape the cost because the inquiry serves also to establish the amount of his liability at a trial. At any rate, where as here the official so mishandles his office that his successor cannot perform unless the records are cleansed of the resulting taint, the investigation is essential to the repair, and we think it would be unjust to treat the cost of investigation in whole or in part as an expense of litigation which the Borough must absorb.

We have no doubt that Hawthorne was liable for the entire expenditure precipitated by his wrong. The question is whether the surety too is liable for that loss, and as to this we turn to the condition of the bonds:

"Now, therefore, if the said Wilbur Henry Hawthorne shall during said term, *truly and faithfully discharge and perform all the duties* of said Office of Tax Collector, Treasurer, and Water Registrar in and for the Borough of Totowa, New Jersey, according to law, and shall keep safe and pay over as required by law, any and all moneys that may come into his hands as such Tax Collector, Treasurer, and Water Registrar, then the above obligation to be void, otherwise to remain in full force and virtue." (Italics added.)

It is clear that Hawthorne's duties included the mainte-nance of these records and hence that the condition of the

bonds was breached. The resulting damages should be paid under the bonds if they were fairly within the contemplation of the parties. We think they were. All the parties had to know that the expenses here incurred would likely follow from the principal's breach of his official duty.

The same result was reached in *Edmunds-Bouvier Savings & Loan Ass'n v. New Amsterdam Casualty Co.*, 389 *Pa.* 79, 132 *A. 2d* 181 (*Sup. Ct.* 1957), and *Ninth Federal Savings & Loan Ass'n of New York City v. United States Fidelity and Guaranty Co.*, 50 *N. Y. S. 2d* 372 (*Sup. Ct.* 1944). Although the bonds in those cases were phrased differently from the bonds before us, we see no pertinent distinction.

Nor can liability be avoided or limited upon the premise that the regular annual audits required by *N. J. S. A.* 40:4-1 would have exposed Hawthorne at an earlier date if they had been properly made. The surety's obligation is not so qualified. Rather the official bond is required by statute for the further assurance of the public. Hence the surety upon an official bond cannot plead that a more watchful obligee could have protected itself from the very wrong which the surety covenanted its principal would not commit. *Restatement of Security* § 177 (1941); *Stearns, Suretyship* (*5th ed. Elder* 1951) § 9.18, *p.* 324.

Accordingly the Borough is entitled to recover the expenses incurred in determining the amount of the shortages and reconstructing the records.

For like reasons the Borough is entitled to recover for the investigation and work with respect to erroneous tax search certificates and also for the cost of determining how much withholding taxes were unpaid.

We are satisfied the Borough should prevail as to all items other than exhibits P-11 and P-12. As to exhibits P-11 and P-12, we are unable to follow the record to determine whether their disallowance was consonant with the views we have expressed above. As to them, the issue is remanded to the trial court for reconsideration in that light, and with the further observation that the surety is not chargeable with so

much of the cost as relates to the period prior to 1950 unless such cost would have been necessarily incurred because of Hawthorne's misconduct in and after 1950.

## IV.

The trial court held the surety liable for interest on the shortages from the date thereof (for convenience the Borough calculated interest from the end of each year upon the total of the defalcations within that year) and also held that a tender by the surety of the sum it conceived to represent its liability did not stop the accrual of further interest. The surety challenges both rulings.

### A.

Hawthorne was required to deposit tax moneys "immediately upon collection." *R. S.* 54:4–73. That he was liable for interest upon moneys he misappropriated from the date of the wrong is not disputed. *Ross v. Walton*, 63 *N. J. L.* 435, 439 (*Sup. Ct.* 1899), affirmed o. b. 67 *N. J. L.* 688 (*E. & A.* 1902); *Sheridan v. Van Winkle*, 43 *N. J. L.* 125, 126 (*Sup. Ct.* 1880); *Board of Justices v. Fennimore*, 1 *N. J. L.* 242 (*Sup. Ct.* 1794); 43 *Am. Jur., Public Officers* § 318, *p.* 121; *McCormick, Damages, p.* 214 (1935).

The surety contends, however, that it is not chargeable with interest except for its own default, which of course could not come to pass until it knew of the loss or until demand upon it. The courts in this country have divided upon the issue. The cases are collected in an annotation, 57 *A. L. R.* 2d 1317 (1958).

We think the surety on an official bond should answer for the same damages for which the principal obligor is liable. The surety underwrites the principal's behavior; it vouches for him. The liability of the principal and the surety upon the bond is in terms one and the same. We see no reason to interpolate a limitation confining the surety's liability to a part of the total wrong of the principal obligor.

In seeking to divorce its liability from that of the principal obligor, the surety speaks of interest as a "penalty," and upon that conception urges it should be saddled with a "penalty" only for its own wrong. But the interest for which Hawthorne is liable it not penal. Rather it is payable as compensation, as damages for the illegal detention or withholding of what was due the Borough. *Jersey City v. Zink,* 133 *N. J. L.* 437, 441 (*E. & A.* 1945); *Kentucky Dept. of Mental Health v. Mullins,* 56 *N. J. Super.* 449, 463 (*App. Div.* 1959), affirmed 31 *N. J.* 598 (1960); *Mahoney v. Minsky,* 39 *N. J.* 208 (1963); *McCormick, Damages, p.* 205 (1935); *cf. Meilink v. Unemployment Reserves Comm. of California,* 314 *U. S.* 564, 62 *S. Ct.* 389, 86 *L. Ed.* 458 (1942).

The loss of use of the moneys was part and parcel of the injury the unfaithful official inflicted upon the Borough. When the surety made its engagement it knew that if the principal obligor breached the condition of the bond, the ensuing loss would include the loss of the use of the moneys misappropriated as well as the moneys themselves. Unless the Borough receives reimbursement for both principal and interest, it will not be made whole. It will suffer a loss in the face of the surety's promise that it would not.

We are satisfied therefore that the surety is answerable for the official's liability for interest. The surety's liability for all damages caused by the official cannot, however, exceed the penal sum of the bond. A surety will be liable beyond the penal sum only for interest with respect to its own default, and ordinarily such further liability would arise only upon demand upon the surety to pay. See *Gloucester City v. Eschbach,* 54 *N. J. L.* 150, 155 (*Sup. Ct.* 1891); *Camden v. Ward,* 67 *N. J. L.* 558, 565 (*E. & A.* 1902); *Massachusetts Bonding & Ins. Co. v. United States,* 97 *F. 2d* 879, 881 (9 *Cir.* 1938); *Burns v. Massachusetts Bonding & Ins. Co.,* 62 *Cal. App. 2d* 972, 146 *P. 2d* 29, 30 (*D. Ct. App.* 1944); *Stearns, Suretyship* (*5th ed. Elder* 1951) § 8.19, *pp.* 283–84.

## B.

The surety tendered its check in full payment. The Borough refused to accept the payment with that condition annexed. The surety contends the offer was effective to stop the running of interest. The trial court correctly held it was not. A tender must be unconditional, *Robins v. Mack International Motor Truck Corp.,* 113 *N. J. L.* 377, 384 (*E. & A.* 1934), and since the tender here would entail the surrender by the Borough of its good-faith claim in excess of the surety's figure, it was improper without regard to the accuracy of the surety's calculation. *Bohler v. Callaway,* 267 *U. S.* 479, 492, 45 *S. Ct.* 431, 69 *L. Ed.* 745, 752–753 (1925); *United Gas Pipe Line Co. v. Tyler Gas Service Co.,* 162 *F. Supp.* 496, 501 (*E. D. Tex.* 1958); 6 *Williston, Contracts* (*rev. ed.* 1938) § 1814, *pp.* 5144–45. Here, in fact, the sum offered proved to be less than what the surety owed.

## Conclusion.

To sum up, we hold:

(1) The payments made by Hawthorne were properly applied by the Borough to his liability for sums misappropriated prior to the dates of the bonds here in suit and interest on those sums.

(2) The surety is liable for the losses caused by Hawthorne's issuance of incorrect search certificates.

(3) The surety is liable for the cost of restoring the integrity of the records of Hawthorne's office, including the cost of all investigation necessary therefor, less so much of the cost, fairly estimated, as is referable to the period prior to 1950 unless those costs were required by Hawthorne's misconduct in the period 1950–1955.

(4) The surety is liable for lawful interest upon all shortages covered by the bonds in question from the dates of the shortages (here, as limited by the Borough, from the end of each year with respect to all shortages within that year).

(5) The surety's liability for all of the foregoing may not exceed the penal sums of the bonds, except that the surety may be liable beyond the penal sums for interest accruing after demand for payment.

(6) The tender made by the surety did not stay the accrual of interest.

The judgment is affirmed in part and reversed in part, and the matter remanded for further proceedings not inconsistent herewith. Costs to the Borough.

SCHETTINO, J. (dissenting in part). I am in accord with the majority view that the cost of reconstructing the records is an expense for which the surety became liable when Hawthorne failed to discharge his duties with respect to the books entrusted to his care. However, I cannot agree that the surety here is liable for the expenses incurred by the Borough in determining the amount of the shortages where they are independent of the restoration costs.

Expenses incurred in auditing (*Museum of Fine Arts v. American Bonding Co.*, 211 *Mass.* 124, 97 *N. E.* 633 (*Sup. Jud. Ct.* 1912)) or investigating (*United States Fidelity & Guaranty Co. v. Douglas' Trustee*, 134 *Ky.* 374, 120 *S. W.* 328 (*Ct. App.* 1909)) the accounts of a defaulting principal cannot be charged to a surety, unless the contract so provides. It is no answer to say, as does the majority, that the expenses were within the contemplation of the parties. "[A] surety is chargeable only according to the strict terms of its undertaking and its obligation cannot and should not be extended either by implication or by construction beyond the confines of its contract * * *." *Monmouth Lumber Co. v. Indemnity Ins. Co.*, 21 *N. J.* 439, 452 (1956).

The surety did not promise to indemnify the Borough against any and all loss arising from Hawthorne's failure to perform his duties; the essence of its obligation was to make good whatever duty he failed to perform, be it (1) remitting moneys that came into his hands, (2) issuing correct tax search certificates, or (3) keeping accurate records. By fail-

ing in (1), the Borough was entitled to the amount embezzled; in (2), to the money lost because of *N. J. S. A.* 54:5–17; and in (3), to the cost of restoring the integrity of the Borough records. The cases cited by the majority, *Ninth Federal Sav. & Loan Ass'n v. United States Fidelity & Guaranty Co.*, 50 *N. Y. S. 2d* 273 (*Sup. Ct.* 1944), and *Edmunds-Bouvier Savings & Loan Ass'n v. New Amsterdam Casualty Co.*, 389 *Pa.* 79, 132 *A. 2d* 181 (*Sup. Ct.* 1957), are distinguishable; the bonds covered "any loss" and "all such losses as the insured may sustain." Furthermore, those cases were struggling primarily with the question of whether restoration costs were covered by the bonds, a question with which we have no difficulty.

Of course, as the majority points out with the example of the X-ray, certain expenditures may produce two results — add to the recoverable damages and advance one's case in court. This can be said of *some* of the auditing work connected with reconstructing the records. But the majority opinion does not so limit the Borough's right to recover, despite the fact that in Judge Pashman's oral opinion he disallowed, *inter alia,* an item of $559 for work done on withholding taxes which the auditor testified had nothing to do with the restoration of the records, and an item of $1,945 for an informational report he found unconnected with restoration work.

Nor can I agree with the majority view that the surety is chargeable with interest from the date of each of Hawthorne's defaults (as computed by the trial court, such interest amounts to $10,926.96). There are two lines of authority on this point, 57 *A. L. R. 2d* 1317 (1958). Those authorities which allow interest against the surety from the time the municipality serves the surety with notice of the breach of the condition of the bond or makes demand for payment appear to follow the more equitable view. For example, in *Clark County v. Howard,* 58 *S. D.* 457, 237 *N. W.* 561 (*Sup. Ct.* 1931), the county treasurer embezzled money over a four-year period. Neither the county nor the surety knew of the

defalcations until almost two years after Howard's term had expired, at which time formal demand was made upon the surety company. The trial court found the defalcations to be about $2,000 less than claimed and awarded interest from the date of each act of embezzlement. The surety appealed, claiming it was not liable for interest before the date of formal demand. The condition of the bond sued upon was in language almost identical to that in the case before us. After extended research of those cases that computed interest from date of default and those from date of demand, the court found both lines unsatisfactory—the latter factually distinguishable and the former without discussion or authority. Yet those holding that interest should be allowed only after demand offered one underlying reason that appealed to the court: the surety should pay interest only for its own default in unjustly withholding payment after being notified.

A similar situation arose in *State v. American Surety Co.,* 37 *N. M.* 411, 24 *P. 2d* 267, 89 *A. L. R.* 1314 (*Sup. Ct.* 1933). Five years after the county treasurer relinquished his office, demand was made upon the surety for shortages due to the treasurer's bookkeeping errors, rather than any intentional fraud. The state sought interest from the date the treasurer left office, but the trial court computed it from the date of demand. The surety did not know of the shortages until the demand was made. As in *Howard,* the court examined both lines of authority and, after discussing *Howard,* went on to say:

"Interest such as is sought in this case is an element of damages for wrongfully depriving the plaintiff of the money due him. It cannot be justly argued that where the surety in good faith is ignorant of the principal's defalcation, and no demand has been made by the obligee, the detention of the money due the obligee is wrongful and interest as an element of damages should under the circumstances be allowed from the date of the principal's defalcation. * * *

On reason and logic, even without precedent, it seems right that demand in this case would appear to be necessary, for it is not a case where the surety would be likely to know of the default in the absence of notice of that fact, and the surety ought not to be held

for more than the amount accrued from their own default in unjustly withholding payment after being notified of the default of the principal." 24 *P. 2d,* at 269.

The most persuasive opinion is *Banking Comm. v. National Surety Corp.,* 243 *Wis.* 542, 11 *N. W. 2d* 171 (*Sup. Ct.* 1943). Plaintiff appointed one Buttrick as special deputy commissioner of banking to assist in liquidating and distributing assets of delinquent banks. Buttrick held this post until June of 1937, at which time he was supposed to turn over all assets in his hands to his successor. Shortages were discovered in 1941 and these were paid by the surety a year later. Plaintiff sought interest damages in consequence of Buttrick's failure to discharge his duties claiming that the measure would be the legal rate of interest from the date each item was converted. The surety denied liability for interest prior to the date of demand.

Relying on section 183 of the *Restatement of Security,* the court distinguished the type of interest for which the surety is liable and that for which he is not:

"* * * the surety is liable for the interest earned by the legal use of public funds only where the principal is authorized to invest these funds. * * * *In such cases the interest attaches as an accretion to the public funds for which the principal is liable to account and the liability for interest is a part of the principal obligation.* Where, however, as here, there is no power or duty to invest, and the only duty of the liquidator or receiver is to hold the funds, the principal has no liability for interest as such. It follows that upon an embezzlement of the principal in such a case the surety's liability is for the principal sum and not for interest." 11 *N. W. 2d,* at *pp.* 173–174. (Emphasis added.)

In discussing the imposition of interest as damages for the detention of funds, the court distinguished the obligation of the surety and that of the principal. From the time Buttrick was required to account and failed to do so, he was liable upon his defalcations. But since the surety knew nothing of the default and was in no position to find out, it was not liable for interest until demand or notice.

My view is consistent with the cases discussed above and with the tendency of our courts to charge and allow interest "in accordance with principles of equity." *Jardine Estates, Inc. v. Donna Brook Corp.*, 42 *N. J. Super.* 332, 340–341 (*App. Div.* 1956).

*For modification*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

*Dissenting in part*—Justice SCHETTINO—1.